Otis ELAM, Plaintiff,

v.

C & P TELEPHONE COMPANY, et al., Defendants.

Civ. A. No. 82–1027.

United States District Court, District of Columbia.

March 2, 1984.

Frederick D. Abramson, Carol S. Rabenhorst, Washington, D.C., for defendants.

Edith Barnett, Washington, D.C., for plaintiff.

## MEMORANDUM OPINION

AUBREY E. ROBINSON, Jr., Chief Judge.

This is an action brought by Plaintiff, Otis Elam, against the Chesapeake & Potomac Telephone Company (hereinafter "C & P") and seven individually named C & P employees who were Plaintiff's supervisors. Until August 1981, Elam was employed as a telephone repair supervisor and was responsible for supervising an eight member craft crew. Plaintiff's position was considered a first-level management position within C & P. Plaintiff's complaint contains various allegations of racial and retaliatory discrimination under 42 U.S.C. §§ 1981, 1985(3) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2(a), 2000e–3(a).

Plaintiff's claims under 42 U.S.C. §§ 1981, 1985(3) were tried to a jury, which rendered a verdict in favor of Plaintiff and awarded him $44,927.03 in compensatory damages. Plaintiff's claims of employment discrimination under Title VII were simultaneously tried to the Court. Currently pending before the Court is Defendants' Motion for Entry of Judgment in their Favor Notwithstanding the Verdict, or, in the Alternative for a New Trial and the Court's ruling on the Title VII claims. For the reasons set forth below, Defendants' Motion for Entry of Judgment in their Favor Notwithstanding the Verdict is granted and

Plaintiff's claims under Title VII are dismissed.

## DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

### Background

The complaint in this action contains numerous allegations of violations of 42 U.S.C. §§ 1981, 1985(3). At the conclusion of Plaintiff's case in chief, Defendants sought dismissal of the action for Plaintiff's failure to have made out a *prima facie* case. After all the evidence had been presented, Defendants requested a directed verdict. On each occasion, the Court eliminated some of the issues and contentions Plaintiff had asserted in his complaint.

In response to Defendants' initial request for dismissal, the Court eliminated the allegation of conspiracy under 42 U.S.C. § 1985(3), as well as Plaintiff's allegations of harrassment relating to tampering with his company car and obscene and annoying phone calls to Plaintiff's home, supposedly made at the direction of Defendants. In response to Defendants' request for a directed verdict at the close of all the evidence, the Court directed a finding of no discrimination or retaliation with respect to the remaining aspects of Plaintiff's claim of harrassment, specifically related to Plaintiff's geographic work assignment, the crew persons assigned to him and his work performance and scheduling difficulties arising out of his participation in the Army Reserves. The Court also rejected Plaintiff's claims that discrimination and retaliation were behind his failure to be transferred or promoted.

Having removed those many issues from jury consideration, the Court allowed only the two remaining ones—Plaintiff's 1981 performance evaluation and his 1981 discharge—to go to the jury to be considered separately as to discrimination and as to retaliation. The jury was asked to consider four issues in its deliberations: (1) whether Plaintiff's 1981 performance appraisal rating of "good" was lower then his actual performance warranted and was given to him because of racial discrimination; (2) whether Plaintiff's 1981 performance appraisal rating of "good" was lower than his actual performance warranted and was given to him because of retaliation for having filed prior discrimination charges; (3) whether Plaintiff's discharge in August 1981 was motivated by racial discrimination and not, as Defendants asserted, because of Plaintiff's falsification of records; and (4) whether the discharge was in fact in retaliation for Plaintiff having filed prior discrimination charges. The jury found for Plaintiff on all four issues. Defendants now move for judgment notwithstanding the verdict contending that the verdict cannot reasonably be derived from the evidence presented at trial.

### Analytical Framework

It is well-settled that a motion for judgment notwithstanding the verdict, pursuant to Fed.R.Civ.P. 50(b), is only a renewal of the moving party's motion for a directed verdict made at the close of all the evidence pursuant to Fed.R.Civ.P. 50(a). The standard for granting a motion under Rule 50(b) is precisely identical to that for granting a motion under Rule 50(a), and the motion for judgment notwithstanding the verdict can be granted only if the directed verdict should have been granted. It follows, therefore, that a party cannot assert in its motion for judgment notwithstanding the verdict a ground not asserted in its directed verdict motion. 5A J. Moore, *Moore's Federal Practice*, ¶ 50.08 (2d. ed. 1981). In this action, there are no procedural impediments to Defendants' motion for judgment notwithstanding the verdict.

The law concerning the standard to be used by the Court in deciding upon a motion for judgment notwithstanding the verdict is clear and settled in this jurisdiction. The motion should not be granted unless the evidence, together with all inferences that can reasonably be drawn therefrom, is so one-sided that reasonable jurors could not disagree on the verdict. *Vander Zee v. Karabatsos*, 589 F.2d 723, 726 (D.C. Cir.1978), *cert. denied*, 441 U.S. 962, 99

S.Ct. 2407, 60 L.Ed.2d 1066 (1979). In the context of an employment discrimination case, the question is whether reasonable persons could have concluded on the basis of the evidence at trial that Defendants discriminated against the Plaintiff. *Coburn v. Pan American World Airways, Inc.,* 711 F.2d 339, 342 (D.C.Cir.1983).

The allocation and order of proof in discrimination cases under Title VII is well-established. The same analysis is applicable in employment discrimination cases brought under 42 U.S.C. § 1981. *See, e.g., Baldwin v. Birmingham Board of Education,* 648 F.2d 950, 959 (5th Cir.1981); *Tagupa v. Board of Directors,* 633 F.2d 1309, 1312 (9th Cir.1980). Plaintiff must prove by a preponderance of the evidence a *prima facie* case of discrimination. If Plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to Defendants to articulate a legitimate, non-discriminatory reason for their action. If Defendants meet that burden, the Plaintiff has the opportunity to prove by a preponderance of the evidence that the reasons offered by Defendants are not the true reasons but pretexts for discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). It is within this analytical framework that the Court must determine whether reasonable persons could have concluded on the basis of the evidence at trial that Defendants discriminated against Plaintiff. *Coburn v. Pan American World Airways, Inc., supra.*

*Plaintiff's 1981 Performance Evaluation*

Plaintiff contends that because of race discrimination and retaliation, he received a "G" (good) performance appraisal instead of a "VG" (very good) or "O" (outstanding) performance rating. In support of his contention, Plaintiff offered his own testimony and two charts that compared certain first-level supervisors in terms of selected numerical objectives and results and the performance evaluations of such supervisors with Plaintiff's performance. The Court assumes, without finding, that Plaintiff established a *prima facie* case of race discrimination and retaliation with respect to his 1981 performance evaluation.

To rebut Elam's *prima facie* showing, Defendants presented an abundance of evidence which showed that Plaintiff's evaluation was based on a legitimate nondiscriminatory reason, that is, the quality of his performance. Defendants presented the testimony of Defendant Braxton Carr, who as Plaintiff's second-level supervisor prepared the performance evaluation at issue. He testified that his assessment of the Plaintiff's performance was not affected by a racial or retaliatory motive. While he gave Plaintiff a "G"—which was the only increased rating that Carr gave that year—Carr said that the evaluation was, if anything, overly generous because the Plaintiff was in the low range of "good" performers.

In addition, Mr. Carr characterized himself as a tough supervisor, who was results oriented and a low grader on evaluations. Carr's self-assessment was confirmed by the testimony of all of the first-level supervisors, with the exception of Plaintiff, under Carr's authority during 1980—Grant Berry, Galt Griesbauer, Jeffrey Norris, Jack Schuenenman and Larry Brady. Of these five supervisors, two believed, like Plaintiff, that Mr. Carr had underevaluated their performance. The two were Griesbauer and Schuenenman, both white. In fact, Carr rated Griesbauer "U" (unsatisfactory)—two steps lower than his previous evaluation by another supervisor—and was responsible for Griesbauer's forced demotion to a craft position. Griesbauer's evaluation was not only lower then the Plaintiff's evaluation, but was two steps lower than anyone else. Schuenenman, who received a "VG" (very good) evaluation was dissatisfied with the rating given by Carr because his previous supervisor had rated him "O" (outstanding) the previous year. The only other Black first-level supervisor besides Plaintiff, Jeffrey Norris, and the remaining white supervisors, Berry and

Brady, believe that Carr had fairly and accurately evaluated their performances.

During 1981, then, the year Plaintiff believes his increased evaluation was not high enough due solely to his race and retaliation, and the first year Plaintiff and the other supervisors were evaluated by Carr, the following ratings were given in the peer group: one Black supervisor (Norris) was given his first evaluation—a "G"—after being promoted from craft to management; two white supervisors (Berry and Brady) retained their previous ratings of "VG"; one white supervisor (Schuenenman) was lowered from "O" to "VG"; one white supervisor (Griesbauer) was downgraded from "G" to "U" and demoted to non-management; and one Black supervisor (Plaintiff) was raised one grade to "G". Only a white supervisor received a "U" and a demotion. Only white supervisors received lower ratings than they had received the previous year under a different supervisor.

Carr's testimony also rebutted the charts submitted by Plaintiff which compared his performance and evaluation with the performance and evaluation of some of Carr's other first-level supervisors. He testified that although the underlying statistics of Plaintiff's chart might show whether or not a supervisor met certain pre-established numerical objectives, only the evaluator can interpret and flesh out the underlying data. For example, in reviewing a supervisor's performance, the evaluator may determine that the underlying objectives may have been too high or too low. The evaluator also knows and takes into account the external factors beyond the rated supervisor's control that aid or hinder in reaching the set objectives. These external factors, such as customer demand for fastidiousness, travel time through traffic, variances in crew, equipment and maintenance of C & P cable systems are all known and taken into account by the second-level supervisor in evaluating the first-levels. None of these factors, however, is contained on Plaintiff's chart.

Similarly, Carr also explained that the experience level of the first-level supervisor is considered, since improvement over the course of time was a factor in the evaluations. He testified that he discerned little improvement in the Plaintiff's performance during the year 1980, and included that factor in evaluating Plaintiff. Consideration of such a factor is a legitimate criterion under C & P's Performance Appraisal Plan. This criterion, however, is not taken into account on Plaintiff's two charts.

Carr also testified that another factor used by him in evaluating his subordinates was their level of commitment and dedication to the job. He testified that during his supervision of Plaintiff he felt that Plaintiff lacked dedication to his job because he often left work early and was rarely available on weekends due to his military obligations. Carr testified that there were clashes between he and the Plaintiff over the Plaintiff's military obligations because he felt that Plaintiff used his Reserve duty commitment as an excuse for his own inability or lack of desire to give the necessary time and attention to his C & P duties. The other first-level supervisors also testified that they felt that Plaintiff lacked dedication and commitment to his C & P job. They testified that they often saw Plaintiff leave work early, heard him conduct military business on C & P time, and noted that as a result of his absence during the weekends, they were often called upon to help out the Plaintiff's inadequately trained and supervised crew.

In sum, Carr stated that Plaintiff's 1981 performance evaluation was not just based on Plaintiff's acceptable results in meeting his objectives as shown on Plaintiff's charts, but also on the subjective factors detailed above, which were known to Carr and weighed in the evaluation process for all the first-level supervisors, not just for Plaintiff. The Court acknowledges that it is easy for subjective factors and criteria to lend themselves to racially discriminatory abuse more readily than objective criteria. As this Circuit's Court of Appeals has recognized, however, there are situations

where employment decisions can, must and should be made on the basis of subjective criteria. In light of the purpose of the civil rights law, it would be anomalous to hold that an employee's rights prohibit employers from using subjective criteria in evaluating an employee's performance. *See Harris v. Group Health Association, Inc.,* 662 F.2d 869, 873 (D.C.Cir.1981).

The testimony of Carr and the other first-level supervisors met the *Burdine* standard imposed on the Defendants to articulate a legitimate reason for the action taken in evaluating Plaintiff. *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094–1095. In light of this showing Plaintiff was then required to show by a preponderance of the evidence that C & P's asserted reason was pretextual. Plaintiff, however, failed utterly to meet his required burden of proving that the Defendant's articulated justification for the 1981 evaluation was pretextual and that the evaluation was in fact motivated by racial discrimination or retaliation.

Plaintiff's only example of Carr's supposed racial prejudice—against other Blacks, not against Plaintiff—was Carr's lowered performance rating of Black craftperson Melvin Reese. Carr fully explained that action, however, and pointed out that it was required under the ratings and that he had done no more than to correct an error that Plaintiff had made. The racial discrimination and retaliation that Carr is supposed to have displayed towards Plaintiff was, according to Plaintiff, manifested in the various forms of "harassment" Carr is alleged to have imposed upon Plaintiff. The Court, however, found no merit to such claims and refused to let the "harassment" contentions go to the jury. Plaintiff offered no other evidence in rebuttal, and failed on cross-examination to undermine the testimony of Carr or Plaintiff's first-level peers.

Since Plaintiff presented no evidence to rebut Defendants' clearly articulated non-discriminatory and non-retaliatory explanation for the 1981 evaluation,

Plaintiff could not possibly have met his burden of proving the explanation a pretext. Evidence of C & P's motive in the 1981 evaluation is "one sided" against the jury's verdict. *Vander Zee v. Karabatsos,* 589 F.2d at 726. Therefore, the Court concludes that the evidence concerning race discrimination and retaliation and the reasonable inferences to be drawn therefrom simply do not support a finding that an unlawful motive was present in the 1981 evaluation. The jury's verdict on the two aspects of the 1981 evaluation is unreasonable and therefore, must be overturned.

*Plaintiff's Discharge in August 1981*

C & P terminated the employment of Plaintiff in August 1981. Plaintiff contends that he was discharged because of racial discrimination and retaliation for filing prior discrimination charges. Defendants contend that Plaintiff was discharged because he allegedly falsified company records.

In challenging his discharge from C & P as discriminatory and retaliatory, Plaintiff testified that the Defendants' investigation of the alleged falsified records was not as thorough as it might have been. Plaintiff's argument seemed to be that he had a right to participate in the Company's investigation of his falsifications, and if he did not participate that would mean that race and retaliation were the real motives for the investigations and all that flowed therefrom. The Court assumes, without finding, that Plaintiff established a *prima facie* showing of race discrimination and retaliation with respect to his discharge.

To rebut Plaintiff's *prima facie* showing, Defendants contended and offered evidence that Plaintiff was discharged because he allegedly falsified company records, an activity which, under C & P policy, invokes disciplinary action that may include discharge. The alleged falsification occurred in filling out the inspection forms that he turned in to his supervisor, Defendant Robert Gearhart, for the month of July 1981.

The first alleged falsification involved a form known within C & P as a "2801" form. On this form Plaintiff noted that he had visited a customer's apartment to inspect a repair crew person's work on a day that Plaintiff did not work. Plaintiff's explanation for this was "human error." Defendants characterized it as falsification of a company record and used it as one of the grounds for Plaintiff's termination.

The apartment in which Plaintiff claimed to have conducted the "during" inspection was that of a Dr. Birriel. Plaintiff contended that Defendants did not even attempt to contact Dr. Birriel to see if the inspection had possibly occurred on another day. Defendant Gearhart claimed that he did try to contact Dr. Birriel during his investigation, but was unsuccessful. In any event, Dr. Birriel stated in his deposition that no one from the telephone company contacted him after his phone was installed over the July 4th weekend. This testimony was used by Plaintiff to argue that Defendants failed to reach Dr. Birriel; the testimony confirms, however, that Plaintiff did not visit Dr. Birriel on a date subsequent to July 3rd to conduct the "post 2801" inspection that he claimed.

The second form of alleged falsification involved Plaintiff's report on the "Field-SAM 7" form of a visit to a customer—Mary Carter—that Mrs. Carter said never took place. Plaintiff attacked the Defendants' investigation as it related to Mrs. Carter because he was not permitted to accompany his supervisors when they questioned Mrs. Carter about Plaintiff's alleged "post" inspection visit. Not allowing Plaintiff to contact Mrs. Carter, however, has no effect on the reasonableness of Defendants' conclusion that Plaintiff had not made the inspection as reported. Gearhart and Carr both testified that the investigation of the Mary Carter "Field-SAM 7" included a phone call and a visit to Carter. Both times she stated that no one from C & P had come to check the repair work on her phone.

With regard to Mary Carter, Plaintiff also turned in a "2801" inspection form with the "Field-SAM 7," which reported that the customer had one phone and that there were no defects found. Mr. Gearhart testified that during his investigatory visit to Carter's apartment he counted two phones and three, possibly, four, defects. He concluded that the defects should have been noted on Plaintiff's "2801" form had Plaintiff actually made the inspection he claimed.

The third form of alleged falsification involved cards known within C & P as "I & R 3AA" cards. These cards were used to record the results of a supervisor's safety inspection of his crew members. Plaintiff allegedly turned in "I & R 3AA" cards purporting to show he conducted safety inspections of his crew. Three of the cards showed that there were no defects relating to a piece of equipment known as the "B voltage tester," when in fact, according to Defendants, there were defects.

Defendants contended that a supervisor's inspection of his craftperson's "B voltage tester" includes watching his craftperson perform the functional test on his "B voltage tester" as well as making sure that the date card found in the pouch of the "B voltage tester" cover is undated. In order to check the "no defects" box on the "I & R 3AA" card, Defendants contended that Plaintiff had to follow the two step procedure set forth above. Plaintiff allegedly falsified records when three "I & R 3AA" cards showed "no defects" with respect to the "B voltage tester" when in fact, the date cards of each had not been updated.

Plaintiff asserted at trial that he was unaware that the safety inspection of the "B voltage tester" required him to inspect the date card as to its currency as well as the equipment itself. Each of the other first-level supervisors testified at trial, however, that whether or not a supervisor watched his craftpersons test their "B voltage tester" is irrelevant if the craftpersons do not complete the test by updating the date card. The Bell System Practice relating to the "B voltage tester" also requires updating of the card. Other evidence showed that in order to score a B voltage

tester as non-defective on the "I & R 3AA card," the supervisor must know that the test has been completely performed within the past thirty days. Plaintiff offered no excuse or explanation for his lack of understanding of this procedure, known to every other first-level supervisor in this unit.

Janet Jones' testimony that Plaintiff watched her test her "B voltage tester" in July 1981 added nothing to support the Plaintiff's case. As stated above, the evidence showed that watching the test alone is insufficient. Moreover, Jones testified that her "B voltage tester" date card was not kept in the proper place. She kept it in the cab of her truck, which procedure in itself should have been scored as a defect by Plaintiff on the "I & R 3AA" card according to Defendants. Moreover, the date card Jones produced from the cab of her truck was dated 7/81 for July, with no indication of the date of the test—another defect which, according to Defendants, Plaintiff should have indicated on the "I & R 3AA" card but did not.

Plaintiff contended throughout this proceeding that Defendants' allegations that he had falsified company records was a slipshod effort to railroad Plaintiff—or to get him on a "trumped up charge" as Plaintiff's counsel repeatedly characterized it. The Court finds, however, that Defendants presented evidence sufficient to meet its burden of articulating a legitimate non-discriminatory reason for Plaintiff's discharge.

The evidence showed that the investigation was begun by Defendant Gearhart, known by everyone to be meticulous about paperwork. Supervisor Schuenenman testified that Gearhart had on more than one occasion called him on his beeper to come back to the garage from the field to correct what Schuenenman regarded as a minor error in paperwork. According to Gearhart, Plaintiff's July inspection report raised an all but inescapable inference of falsification for a number of reasons. According to him, there were too many "errors" in too short a period of time, made by too experienced a supervisor, who had to do a month's worth of inspections in half the normal time due to his military reserve obligations. All of this caused Gearhart to be suspicious and with the advice of C & P counsel and his supervisor he began to conduct an investigation to check his suspicions.

Initially, Gearhart had Frank Schrom, another first-level supervisor, and Plaintiff conduct truck inspections to verify that Plaintiff knew that checking to see that the date card was current was part of the "B voltage tester" test. Defendant Jay Jones, who watched these test inspections, verified that both Schrom and Plaintiff knew the correct procedure. Gearhart also attempted to verify that the repair work on the two "2801's" that Plaintiff claimed to have inspected on July 3rd, actually was performed on July 3rd. Gearhart testified that with the help of Carr, he tried to call every customer for whom Plaintiff had turned in a "2801" or "Field SAM 7" for July, including Dr. Birriel. When Mrs. Carter was reached and said that no inspection had been made, Gearhart and Carr visited her to verify her recollection. Gearhart then went up the chain of command to Defendant Donald Heck, the fourth-level supervisor, who concurred in Gearhart's conclusion and then consulted C & P counsel regarding the appropriate procedures to take under the circumstances. Defendant, Paul Hudson, the fifth-level supervisor was also consulted. Relying on the conclusions of his subordinates, Hudson concurred in the decision that the Company should get rid of a dishonest manager.

Once Defendants met the burden of articulating a legitimate, non-discriminatory reason for Plaintiff's discharge, which the Court finds they did, the burden shifted to Plaintiff to show that the reason offered by Defendants was not the true reason for his discharge but a mere pretext for discrimination or retaliation. Plaintiff in this case completely failed to do so.

The records involved in this matter related to safety and customer service, which according to the Defendants and witnesses, were two of the most important aspects of

C & P's business. Add to this the Company's belief that it was dealing with a possibly dishonest management level employee and that falsification of records is an activity which under C & P policy invokes disciplinary action that may include discharge. Plaintiff came up with nothing to rebut this or to show that the reasons offered were pretextual. There was no evidence offered to establish that Plaintiff was accorded disparate treatment.

■ In light of the evidence presented at trial, the Court finds that the jury's verdict with respect to the discharge issue is unreasonable and unsupportable as a matter of law. The Court, therefore, overturns the jury verdict on the basis of the applicable legal standard and the weight of the evidence.

### PLAINTIFF'S TITLE VII CLAIMS

This action was brought also under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Plaintiff alleged that he received a low performance evaluation, was denied transfers and wage increases, was denied promotions, was harassed, and subsequently terminated by Defendants as a result of racial discrimination and retaliation in violation of Title VII. These claims were tried simultaneously to the Court with Plaintiff's other claims discussed above. The ruling of the Court with respect to Plaintiff's Title VII claims is set forth below.

*Transfers and wage increases*

■ Plaintiff contended that Defendants failed to process his transfer request and subsequently denied him a transfer in March 1980 because of his race and in retaliation for filing an EEO complaint. To establish a *prima facie* case of discriminatory denial of transfer, Plaintiff must establish that (1) he applied for an available position; (2) he was qualified for an available position; and (3) he was rejected under circumstances which give rise to an inference of unlawful discrimination in that his failure to be transferred was more likely than not based on consideration of impermissible factors. *Texas Department of*

*Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Coe v. Yellow Freight Systems, Inc.*, 646 F.2d 444, 450 (10th Cir.1981). A *prima facie* showing of retaliation requires Plaintiff to show (1) statutorily protected participation; (2) adverse employment action; (3) a causal connection between the two; and (4) that he had the minimum qualifications for the transfer at issue. *Williams v. Boornstin*, 663 F.2d 109, 117 (D.C.Cir. 1980); *Womack v. Munson*, 619 F.2d 1292 (8th Cir.1980).

Plaintiff pointed to two transfers which occurred during the time period in which Defendants allegedly denied him a transfer opportunity. First, Plaintiff noted the transfer of Galt Griesbauer, a white first-level supervisor. The evidence showed, however, that the "transfer" of Galt Griesbauer was actually a demotion because Defendant Carr felt that Griesbauer was not satisfactorily performing his duty in the management position. Second, Plaintiff pointed to the transfer of Harold Maloney to a staff supervisor level position in personnel. Plaintiff, however, failed to establish at trial that he was qualified for the position that Maloney received.

Finally, Plaintiff does not point to any transfers of first or second-level supervisors which occurred within his district during the relevant time period. The evidence shows that Plaintiff cannot point to any such transfer because during the time that Plaintiff was seeking a transfer, the district manager, Blanche Rath, was not allowing any lateral transfers of first or second-level supervisors within or without her district. As district manager, Rath made this decision because the production and service within the district at that time was poor and she wanted to keep experienced supervisors in an attempt to make an improvement.

■ Assuming, but not finding, that Plaintiff established a *prima facie* showing of race discrimination and retaliation with respect to the transfer claim, the Court finds that the reason offered by Defend-

ants for not allowing Plaintiff to transfer was sufficient to meet the burden of articulating a legitimate non-discriminatory reason for their action. Plaintiff offered no evidence to demonstrate that Defendant's reason for not allowing him to transfer is a pretext and therefore, he cannot prevail on this claim.

*Promotion*

■ Plaintiff contends that he was denied promotions because of race discrimination and retaliation. He contends further that had he been fairly evaluated in 1981, he would have been promoted. The elements of a *prima facie* case of retaliation have been set forth above. In order to establish a *prima facie* case of discriminatory denial of promotion Plaintiff must show that (1) he belongs to a protected group; (2) he was qualified for and applied for a promotion; (3) he was considered for and denied a promotion; and (4) other employees of similar qualifications who were not members of the protected group were promoted at the time the Plaintiff's request for promotion was denied. *Bundy v. Jackson,* 641 F.2d 934, 951 (D.C.Cir.1981).

■ Initially, the Court concludes that Plaintiff failed to establish a *prima facie* case of discrimination or retaliation with respect to the promotion claim. Plaintiff, at no time, pointed to any specific promotion which was vacant or for which he applied and was denied. Absent these two elements, Plaintiff has not established any inference of race discrimination or retaliation. Assuming that Plaintiff considered the staff supervisor level position in personnel that was filled by Harold Maloney a promotion, as discussed above, Plaintiff failed to prove that he was qualified for the position or that his qualifications were similar to Maloney's. Finally, with respect to the claim of retaliation and the denial of the promotion, Plaintiff offered no evidence to show a causal connection between the two, that is, he failed to show that Linda Spear, who chose Maloney for the position, knew or should have known that Plaintiff had filed an EEO complaint.

*Harassment*

Plaintiff claimed also that he was harassed by Defendants because of his race and in retaliation for filing an EEO charge. According to Plaintiff, this harassment was in the form of assigning him the worst work crew and worst geographic area, making obscene phone calls to his home, tampering with his company car, and scheduling him to work when he was scheduled for Army Reserve duty.

■ The elements of a *prima facie* case of employment discrimination are not confined to an inflexible formula, but necessarily vary from case-to-case, depending upon the underlying factual situation. *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. However its precise elements are defined, a *prima facie* case consists of proof of actions taken by the employer from which one can "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Construction Co. v. Waters,* 438 U.S. 567, 580, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978).

■ Based on the evidence adduced at trial the Court concludes that Plaintiff failed to establish a *prima facie* case of race discrimination or retaliation with respect to his claims of harassment. There was no evidence adduced at trial to link the claims of obscene phone calls and the tampering with Plaintiff's company car to Defendants or any individual employed by Defendant C & P. Also, there was no evidence put forth by Plaintiff from which the Court could "infer a discriminatory animus" with respect to the assignment of Plaintiff's work crew and geographic work area. The evidence established that all of the first-level supervisors had their share of inexperienced and "loaned in" crew members. Similarly, the evidence established that Plaintiff's geographic work area was no "worse" than any of the areas of the other first-level supervisors. Each su-

pervisor had some complaint about the geographic work area assigned to him for various reasons and Plaintiff produced no evidence which would establish that his work area was assigned to him based on illegal motives. Furthermore, it was established at trial that all geographic areas were assigned to first-level supervisors by the "luck of the draw."

Finally, with respect to Plaintiff's claim of harassment and scheduling difficulties arising out of his participation in the Army Reserves, Plaintiff failed to produce any evidence of disparate treatment. He produced no evidence to establish that white first-level supervisors with Army Reserves obligations or supervisors who had not filed EEO charges were treated any differently with respect to their work responsibilities and schedules. The evidence adduced at trial established that all work schedules were made up in advance with no consideration given to the fact that a first-level supervisor might have Army Reserves duty or other obligations on a day on which he was scheduled to work. It was the supervisor's responsibility to find a replacement to work for him if he had such other obligations.

*1981 Evaluation and Discharge*

The Court has assessed already the evidence as it relates to the claims of discrimination and retaliation with respect to Plaintiff's 1981 evaluation and discharge in the section of this Memorandum addressing Defendants' Motion for Judgment Notwithstanding the Verdict. It is well-settled that the allocations and orders of proof in Title VII cases and cases brought under 42 U.S.C. § 1981 are the same. *See, e.g., Baldwin v. Birmingham Board of Education, supra; Tagupa v. Board of Directors, supra.* Therefore, for the reasons set forth in the Court's earlier discussion of these claims under 42 U.S.C. § 1981, the Court concludes that the 1981 evaluation and discharge claims under Title VII must also be dismissed.

An appropriate Order accompanies this Memorandum Opinion.

ORDER

In accordance with the Memorandum Opinion entered this date, it is by the Court this 2nd day of March, 1984,

ORDERED, that Defendants' Motion for Judgment in their Favor Notwithstanding the Verdict be and hereby is GRANTED; and it is

FURTHER ORDERED, that judgment be and hereby is entered in favor of Defendants and against Plaintiff on all claims raised in this action; and it is

FURTHER ORDERED, that the above-captioned action be and hereby is DISMISSED.