**Yasamin PAKIZEGI, Plaintiff,**

v.

**FIRST NATIONAL BANK OF BOSTON, Defendant.**

Civ. A. No. 91–11868–GN.

United States District Court, D. Massachusetts.

Aug. 13, 1993.

Isiah Shalom, Cambridge, MA, Robert M. Warren, Somerville, MA, Matthew Cobb, Law Firm of Matthew Cobb, Boston, MA, Catherine A. Becker, Norwood, MA, for plaintiff.

Yasamin Pakizegi, pro se.

Robert B. Gordon, Richard P. Ward, Ropes & Gray, Boston, MA, for defendant.

## MEMORANDUM OF DECISION

GORTON, District Judge.

## I. INTRODUCTION

The plaintiff, Yasamin Pakizegi, originally filed her complaint in this action on July 15, 1991, which she first amended on July 16, 1991, and subsequently amended on July 31, 1991. In her complaint, the plaintiff alleges claims against the defendant, First National Bank of Boston ("the Bank"), for 1) national origin discrimination in violation of Title VII (42 U.S.C. § 2000e *et seq.*), and 2) breach of an implied contract for employment. The plaintiff's claims stem from the Bank's termination of her employment as a secretary on April 1, 1988.

The Bank moved for summary judgment on both counts of the plaintiff's complaint on July 29, 1992. The plaintiff filed her opposition to that motion on December 9, 1992. For the reasons set forth in this decision, the Bank's motion for summary judgment on both counts is allowed and judgment for the Bank will be entered accordingly.

## II. FACTS

Many of the material facts in this action are not genuinely disputed. Where such disputes do exist, the conflicting claims are noted. The plaintiff, Ms. Pakizegi, is Iranian. Ms. Pakizegi began to work for the Bank in April of 1985 as a temporary secretary. Shortly thereafter, in June of 1985, the Bank made Ms. Pakizegi a full-time administrative secretary. Ms. Pakizegi did not have a written employment contract with the Bank. She was provided with the Bank's employee handbook which governed the terms and conditions of her employment, and which expressly stated that the Bank reserved the right to terminate an employee's employment at any time and for any reason.

Between approximately June, 1985 and December, 1987, Ms. Pakizegi worked as an administrative secretary in the Bank's Telecommunications Department and reported directly to Mr. John Doggett. Ms. Pakizegi performed clerical services for about 40 employees in the telecommunications group, including, but not limited to, Mr. Doggett.

During 1986, Ms. Pakizegi apparently had an ongoing conflict with a co-worker, Ms. Heidi Dephouse. At one point, Ms. Dephouse posted two photographs in her own work cubicle. One photograph was of the Ayatollah Khomeni, and the other was a photograph of an American flag burning in Iran. Ms. Pakizegi found these pictures offensive, and complained about these pictures to Mr.

Doggett. Mr. Doggett agreed that the pictures were offensive, and had Ms. Dephouse remove the pictures. Approximately two to three weeks passed before the pictures were removed. Mr. Doggett then arranged to have Ms. Dephouse moved to another area of the Bank, and Ms. Dephouse was subsequently discharged from employment with the Bank altogether.

In the early fall of 1987, Mr. Doggett was transferred from the Telecommunications Department to the Corporate Information and Technology Division which required Mr. Doggett to move from the Bank's Keystone Building to the Bank's head office. As secretary to the Telecommunications Department, Ms. Pakizegi remained at the Keystone building.

Ms. Pakizegi alleges that after Mr. Doggett transferred to the head office, Mr. Doggett told her that he wanted her to continue working for him at the head office, but that Mr. Lawrence Robbins, Director of Systems, was opposed. Ms. Pakizegi claims that Mr. Doggett also told her that Mr. Robbins had told him that Mr. Robbins did not like Ms. Pakizegi because she was Iranian. The Bank denies that Mr. Robbins or Mr. Doggett ever made such statements.

In October, 1987, Ms. Pakizegi advised Bank officials that she wanted to be relocated to the Bank's head office, so that she could work for Mr. Doggett. Ms. Pakizegi asked Mr. Robbins for an immediate transfer to a position in the Corporate Information and Technology Division. Mr. Robbins told Ms. Pakizegi that if that division had a secretarial vacancy, she would be considered for the position. In November, 1987, an executive assistant position became available in the Corporate Information and Technology Division. Ms. Pakizegi spoke to Mr. Doggett about the position, and Mr. Doggett told her that she would have to apply for the position through the Bank's normal posting procedures. Ms. Pakizegi thereupon submitted an application for the position.

The Bank's posting procedures anticipated that a Bank recruiter would screen candidate's applications to determine which applicants met the minimum qualifications for a position. Those candidates who failed to satisfy such requirements received no further consideration for the position. The secretarial position for which Ms. Pakizegi applied required candidates to take typing and shorthand tests to establish their threshold qualifications for the job. The position required a minimum typing score of 65 words per minute and a shorthand score of 80.

Ms. Pakizegi and two other Bank employees, one of whom was Ms. Patricia Santarlasci, took the requisite tests for the executive assistant position. Ms. Pakizegi scored 56 words per minute on the typing test and a 49 on the shorthand test. Ms. Pakizegi's application form reflects a notation that Ms. Pakizegi "did not do well on typing and shorthand tests". Ms. Santarlasci scored a 79 on the typing test and a 62 on the shorthand test. The Bank claims that on the basis of test performances, it selected Ms. Santarlasci to fill the secretarial position.

The Bank, through Ms. Heidi Forte, a Bank Human Resources representative, notified Ms. Pakizegi that because of her low scores, she would not be interviewed for the secretarial position. Ms. Pakizegi claims that she was told that Mr. Robbins was responsible for making that decision, but the Bank denies that he had any such input.

Ms. Pakizegi was apparently upset about not obtaining the position and, on December 20, 1987, located Mr. Doggett, who was then in a meeting with his supervisor, Mr. John Rogers. Ms. Pakizegi interrupted the meeting to discuss the fact that she was not offered the secretarial position. Following that incident, Mr. Doggett issued Ms. Pakizegi a written warning based on the fact that she had interrupted the meeting to discuss her failure to secure the secretarial position. Ms. Pakizegi claims that after she was denied the secretarial transfer, she complained that she was being discriminated against, whereupon she was told by Messrs. Doggett and Rogers that unless she "took back" what she said about the discrimination within 30 days, she would be fired.

The Bank claims that Ms. Pakizegi's job performance then began to deteriorate. Ms. Pakizegi continued to serve as Telecommunications Department secretary and reported

to Mr. Thomas Courtney. The Bank alleges that Ms. Pakizegi attempted to recast her position as personal secretary to Mr. Doggett and that she refused to do the work of members of the Telecommunications Group. Her conduct prompted Mr. Courtney to issue Ms. Pakizegi a formal job description on January 5, 1988, which made it clear that Ms. Pakizegi was responsible for carrying out assigned tasks of the Telecommunications Department.

The Bank claims that Ms. Pakizegi continued to resist doing tasks assigned to her. On January 11, 1988, Mr. John Fabiano wrote Mr. Courtney complaining that Ms. Pakizegi refused to type a memorandum for him which prompted Mr. Courtney, in turn, to remind Ms. Pakizegi in writing that it was her job to serve the clerical needs of the Telecommunications Department. On January 20, 1988, Mr. Gerald Cassidy, a manager, complained by letter to Mr. Courtney about Ms. Pakizegi's refusal to do requested work, whereupon Mr. Courtney issued a written reprimand to Ms. Pakizegi. On March 2, 1988, Mr. Gary Gearhart advised Mr. Courtney that Ms. Pakizegi had told the Bank's switchboard that all telephone calls to Mr. Doggett should be referred to her. Mr. Courtney then issued Ms. Pakizegi another disciplinary warning.

Following these incidents, Ms. Pakizegi was apparently very upset, and during a telephone conversation with a co-worker, Ms. Gayle Lawson, Ms. Pakizegi allegedly stated that everyone was out to get her and that she would get even. Ms. Lawson notified a Bank officer. Ms. Pakizegi was interviewed by a representative of the Human Resources Department to review her infractions and was advised not to threaten co-workers.

On March 7, 1988, Mr. Courtney issued Ms. Pakizegi a "final written warning". Despite that warning, the Bank claims that Ms. Pakizegi then had Mr. Doggett's mail forwarded directly to her, rather than to his regular secretary. On March 18, 1988, Mr. Courtney confronted Ms. Pakizegi about the mail forwarding and advised her to stop doing it. On March 29, 1988, Mr. Courtney met with Ms. Pakizegi, and told her that Mr. Doggett's secretary had complained that she was not receiving any of Mr. Doggett's mail. Ms. Pakizegi became upset and yelled at Mr. Courtney and accused him of plotting against her.

Ms. Pakizegi claims that all of the accusations against her regarding refusals to do requested work, forwarding telephone calls and mail and threatening co-workers are false. Moreover, she claims that those complaints and reprimands were part of an overall conspiracy by the Bank to have her fired because of her national origin. Ms. Pakizegi claims that "dear friends" told her that it was bank policy to have co-workers manufacture false complaints about an employee's work, when they wanted to dismiss that employee for discriminatory reasons. The Bank denies that such a conspiracy ever existed.

On April 1, 1988, the Bank terminated Ms. Pakizegi's employment. Mr. Courtney claims that he based his decision to discharge Ms. Pakizegi on her disruptive and defiant behavior and on her failure to act in a cooperative and professional manner at work despite repeated warnings to do so.

### III. THE LAW

#### A. Defendant's Motion to Strike the Appearance of Plaintiff's Successor Counsel and to Remove all Pleadings Filed By Said Counsel

As a preliminary matter, on March 4, 1993, the defendant Bank filed a motion to strike the appearance of plaintiff's successor counsel and to remove all papers filed by the successor counsel. Those papers included a revised opposition to the defendant's summary judgment motion and a revised affidavit in support of that opposition. The plaintiff's opposition to the Bank's summary judgment motion was originally due on August 12, 1992. At plaintiff's request, the Court extended that deadline until December 7, 1992. The plaintiff filed her initial opposition to the Bank's summary judgment motion on December 9, 1992. On February 24, 1993, at the summary judgment hearing, Ms. Pakizegi appeared with her fourth attorney, the first three having successfully sought leave to withdraw one after the other. Plaintiff's current counsel sought to file a revised oppo-

sition to the Bank's summary judgment motion, as well as a revised affidavit of Ms. Pakizegi, which raised new factual issues and, in some respects, contradicted plaintiff's earlier filings.

■ The plaintiff has consistently tested the limits of this Court's patience with requests to permit her to amend and reamend her pleadings and motions for continuances in light of her efforts to secure new counsel to represent her. This Court has previously gone out of its way to accommodate the plaintiff, and has granted her every leniency. To permit her, however, to amend her summary judgment opposition more than two months after it was originally filed, and to require the Bank to oppose that revised opposition would be unfair. The plaintiff cannot simply flaunt the Court's deadlines and proceed with this litigation on her own personal schedule. Moreover, the plaintiff will not be permitted to allege new and different facts and to change her position in this litigation every several months and force the Bank to defend against a moving target. Therefore, the defendant's motion to strike the plaintiff's revised opposition to this summary judgment motion will be allowed. The Court will not, however, strike the appearance of the plaintiff's fourth successor counsel.

B. *The Summary Judgment Standard*

■ Summary Judgment shall be entered where the pleadings, discovery on file and affidavits, if any, show "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When one party has moved for summary judgment, it then falls to the opposing party to demonstrate a genuine disagreement as to some material fact. "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party [and] 'material' means that the fact is one that might affect the outcome of the suit under the governing law." *United States v. One Parcel of Real Property, Etc. (Great Harbor Neck, New Shoreham, R.I.),* 960 F.2d 200, 204 (1st Cir.1992) (citations and internal quotation marks omitted). On a motion for summary judgment, the Court views the evidence and all reasonable inferences to be gleaned therefrom in the light most favorable to the nonmoving party. *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993).

■ When a movant-defendant has suggested that competent evidence to prove the case is missing, the burden devolves upon the nonmovant-plaintiff to document some factual disagreement sufficient to withstand summary judgment. *Wynne v. Tufts University School of Medicine,* 976 F.2d 791, 794 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993), *quoting Mesnick v. General Electric Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). The nonmovant-plaintiff must be able to point to specific, competent evidence to support its claim. *Wynne,* 976 F.2d at 794. Mere allegations or conjecture unsupported in the record are insufficient to raise a genuine issue of material fact. *Wynne,* 976 F.2d at 794; *Mack v. Great Atlantic & Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989).

C. *The Title VII Claim*

■ In Count I of the Amended Complaint, the plaintiff alleges that the Bank discharged her from employment because of her national origin (Iranian) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The inquiry in this Title VII case is whether, when the Bank fired Ms. Pakizegi, it intentionally discriminated against her because of her national origin. The plaintiff may prove intentional discrimination by direct evidence or through facts which support an inference of discrimination. *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 107 (1st Cir.1988). Ms. Pakizegi has failed to proffer any direct proof that the Bank terminated her employment because she was Iranian. Rather, she relies on indirect proof. Therefore, the now familiar burden shifting framework recognized in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) provides the proper frame of reference in which to analyze the plaintiff's claim of discrimination. *See Lawrence v. Northrop*

Corp., 980 F.2d 66, 68 (1st Cir.1992); *Oliver,* 846 F.2d at 107.

The plaintiff must first establish a prima facie case, introducing facts that, standing alone, permit the inference of discrimination based on national origin. *Lawrence,* 980 F.2d at 69; *Oliver,* 846 F.2d at 107. The plaintiff satisfies this step by showing that: 1) she was Iranian, 2) her work was sufficient to meet her employer's legitimate expectations, and 3) she was discharged and replaced by someone with roughly similar qualifications. *See Lawrence,* 980 F.2d at 69; *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). Once the plaintiff has established a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's termination. *Lawrence,* 980 F.2d at 69; *Oliver,* 846 F.2d at 107. If the defendant provides such a reason, the plaintiff must prove that the reason given is merely a pretext for national origin discrimination. *Id.; Medina–Munoz,* 896 F.2d at 9. It should be emphasized that to prevail ultimately at this stage, a plaintiff must do more than simply refute or cast doubt on the defendant's rationale for the termination. *See Medina–Munoz,* 896 F.2d at 9. Rather, the plaintiff must show that the employer fired her because of a discriminatory animus based on national origin. *See Lawrence,* 980 F.2d at 69; *Medina–Munoz,* 896 F.2d at 9; *Menard v. First Security Services Corp.,* 848 F.2d 281, 287 (1st Cir.1988).

For the purpose of this summary judgment motion, the Court will assume that Ms. Pakizegi has satisfied her burden of making out a prima facie case of national origin discrimination. Therefore, the burden shifts to the Bank to articulate a valid, non-discriminatory reason for dismissing Ms. Pakizegi. The Bank has articulated such a reason by stating that it dismissed Ms. Pakizegi from her position as an administrative secretary because, in the face of repeated written warnings from her immediate supervisor, Mr. Courtney, she continued to display unprofessional behavior on the job. According to complaints which were transmitted from co-workers to Mr. Courtney, Ms. Pakizegi: 1) resisted performing assigned work

for managers in the Telecommunications Department, 2) defied clear directives from her superiors, 3) disrupted the work of her department by insisting that she was the personal secretary of Mr. Doggett, a manager who no longer worked in the same building, and 4) threatened colleagues. Based upon those alleged facts, the Bank states that it discharged Ms. Pakizegi from employment.

Because the Bank has stated sufficient legitimate reasons for its decision to terminate Ms. Pakizegi, the burden thus shifts back to the plaintiff to prove that the articulated reasons were merely a pretext for national origin discrimination. Ms. Pakizegi attempts to meet her burden of proving the Bank's discriminatory animus through four alleged facts:

1) in the Fall of 1986, a co-employee, Heidi Dephouse, hung pictures of the Ayatollah Khomeni and a burning American flag in Iran in her own cubicle, and that the Bank failed to have the pictures removed for several weeks;

2) John Doggett, Ms. Pakizegi's former supervisor, told her that Lawrence Robbins, a Bank manager, did not like her because she was Iranian;

3) after Ms. Pakizegi was denied a secretarial transfer, and complained that she was being discriminated against, she was told by Mr. Doggett and Mr. Rogers that unless she "took back" what she said about discrimination within thirty days, she would be fired;

4) the complaints levelled against her by her co-workers and supervisors were unfounded and part of a conspiracy to create false documentation in order to justify her discriminatory discharge.

These alleged facts, taken separately or in combination, do not enable Ms. Pakizegi to satisfy her burden of proving discriminatory animus by the Bank in its decision to discharge her, and the plaintiff's Title VII claim therefore fails as a matter of law.

1. The Dephouse Incident

With respect to Ms. Pakizegi's first proffered piece of evidence of discrimination, she claims that in the Fall of 1986, Ms.

Dephouse hung offensive, anti-Iranian pictures in Ms. Dephouse's own cubicle, and that after Ms. Pakizegi complained to Mr. Doggett about these pictures, the Bank took too long to have Ms. Dephouse remove the pictures. An employer is responsible for acts of national-origin harassment by coworkers in the workplace, *unless* the employer can show that it took "immediate and appropriate corrective action." 29 C.F.R. § 1606.8(d). There is no dispute that after Ms. Pakizegi complained about the offensive photographs, Mr. Doggett ordered Ms. Dephouse to remove the pictures, had Ms. Dephouse transferred to another area of the Bank and subsequently discharged Ms. Dephouse, as part of the Bank's corrective action. Based on these actions, the evidence suggests that the Bank acted to ensure that discriminatory, anti-Iranian conduct would not be tolerated. The Dephouse incident fails to indicate that, historically, the Bank demonstrated a bias against Ms. Pakizegi because she was Iranian.

**2. The Alleged Statement by Mr. Robbins**

To prove discriminatory animus, Ms. Pakizegi next relies on the alleged fact that Mr. Doggett told her that Mr. Robbins told him that Mr. Robbins did not like Ms. Pakizegi because she was Iranian. First, the alleged statement is inadmissible hearsay which cannot be offered as evidence to defeat the Bank's summary judgment motion. A plaintiff opposing summary judgment cannot rely on hearsay or other inadmissible evidence to satisfy its burden of proving discrimination. *See* Fed.R.Civ.P. 56(e).

Ms. Pakizegi here relies on double hearsay, an out of court statement of Mr. Robbins made to Mr. Doggett, and Mr. Doggett's out of court statement made to Ms. Pakizegi, offered to prove the truth of the matter asserted, i.e. discriminatory animus. Fed. R.Evid. 805 provides that hearsay included within hearsay is not excluded under the hearsay rule, if each part of the combined statement conforms with an exception to the hearsay rule. The Court therefore initially considers the first layer of hearsay, the statement by Mr. Robbins to Mr. Doggett, to see if it falls within an exception to the hearsay rule.

Fed.R.Evid. 801(d)(2)(D) provides that a statement is not hearsay if it is offered against a party and is a statement by his agent concerning a matter within the scope of his employment, made during the existence of the employment relationship. The same rule requires the proffering party to lay a foundation to show that an otherwise excludable statement by an agent relates to a matter within the scope of the agent's employment. *Breneman v. Kennecott Corp.,* 799 F.2d 470, 473 (9th Cir.1986); *Mitroff v. Xomox Corp.,* 797 F.2d 271, 276 (6th Cir. 1986). The statement by Mr. Robbins to Mr. Doggett falls outside the coverage of Rule 801(d)(2)(D). Ms. Pakizegi has not proffered any evidence indicating under what circumstances Mr. Robbins allegedly made that statement. More specifically, Ms. Pakizegi has not introduced any evidence demonstrating that Mr. Robbins had responsibility for supervising her work, or that Mr. Robbins made the statement within the scope of his employment for the Bank. The statement cannot, therefore, be considered a vicarious admission by the Bank and is inadmissible.

Even assuming *arguendo* that Mr. Robbins' hearsay statement is admissible, the statement is not relevant to show that the Bank was motivated by discriminatory animus in its decision to discharge Ms. Pakizegi. Ms. Pakizegi apparently claims that Mr. Robbins' alleged anti-Iranian sentiment, as evidenced by his statement, later influenced the Bank's decision to deny Ms. Pakizegi the secretarial transfer in November, 1987. Ms. Pakizegi claims that Mr. Robbins was responsible for denying her the transfer, but fails to base her claim in fact. She speculates that because the human resources report indicates that her application for the secretarial transfer was routed to Mr. Robbins, he must have been responsible for the decision to deny her the transfer.

The plaintiff fails to offer evidence that Mr. Robbins actually had any substantive input whatsoever into the denial of Ms. Pakizegi's transfer application. Rather, the undisputed evidence indicates that Ms. Pakizegi failed the requisite typing and

shorthand tests for the secretarial position, which objectively grounds the Bank's contention that Ms. Pakizegi's application was denied at the screening stage because she did not possess the requisite minimum secretarial skills for the position. Ms. Pakizegi introduced no evidence that suggests that the decision to deny her the transfer based on her poor test performance was pretextual or that the denial was motivated by discriminatory animus.[1]

More importantly, the alleged discriminatory act being challenged in this action is Ms. Pakizegi's discharge. Ms. Pakizegi has not introduced any evidence which disputes the Bank's claim that Mr. Courtney was responsible for the decision to discharge Ms. Pakizegi and that he did so on the basis of persistent complaints regarding Ms. Pakizegi's behavior and performance in the Telecommunications Department. There is no evidence that Mr. Courtney shared Mr. Robbin's alleged anti-Iranian sentiment. Nor has the plaintiff introduced any evidence that Mr. Robbins participated in, or otherwise influenced, Mr. Courtney's decision to terminate her employment. The bias of one who

neither makes nor influences the challenged personnel decision is not probative in an employment discrimination case. *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir.1990); *see also Gray v. New England Telephone & Telegraph Co.*, 792 F.2d 251, 255 (1st Cir.1986); *Fisher v. Flynn*, 598 F.2d 663, 665 (1st Cir.1979).

### 3. Ms. Pakizegi's Earlier Claim of Discrimination

Ms. Pakizegi next claims that after she was denied the secretarial transfer, she complained to the Bank that she was being discriminated against and that Mr. Doggett and Mr. Rogers told her to "take it back" within thirty days, or she would be fired. Despite the inherent unlikelihood that senior bank officials would chant the childhood mantra "take it back" in this business context, for the purposes of this summary judgment motion, the Court assumes that the statements were made. The plaintiff does not claim that she in fact, "took back" the discrimination allegations. Thus, despite the fact that her allegation was not retracted within the allotted thirty days, or ever, Ms. Pakizegi's em-

1. The plaintiff has attempted to prove discrimination in this action by emphasizing allegations surrounding the Dephouse incident, which occurred in the Fall of 1986, and the Bank's denial of Ms. Pakizegi's application to transfer to another secretarial position, which occurred in November of 1987. The plaintiff apparently first filed her complaint with the Equal Employment Opportunity Commission ("EEOC") in September of 1988, two years after the Dephouse incident, and ten months after the Bank's denial of the plaintiff's transfer application. The statute of limitations had therefore run with respect to these two incidents. The only incident falling within the actionable 300 day statutory timeframe is Ms. Pakizegi's discharge.

The plaintiff may argue that her discharge was a continuing serial violation of her civil rights in that there were a number of discriminatory acts emanating from the same discriminatory animus and that each act constituted a separate wrong actionable under Title VII and seek a remedy with respect to these continuing violations. *See e.g. Sabree v. United Brotherhood of Carpenters and Joiners*, 921 F.2d 396, 399 (1st Cir.1990). Once a plaintiff has shown that discrimination continues into the actionable period, the plaintiff may also recover for portions of the persistent process of illegal discrimination that antedated the limitations period. *Id.* at 401. Before a plaintiff can reach back, however, she must

prove a substantial relationship between the acts. *Id.* Without a substantial relationship between timely and untimely claims, the claims cannot be viewed as a continuing violation. *Id.*

To determine if a "substantial relationship" exists, the First Circuit has found that the most important factor to consider is the degree of permanence, and whether the prior, untimely incident, should have triggered the employees awareness and duty to assert her civil rights. *Id.* at 402. A claim arising out of an injury which is continuing only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 300 day limitation period. *Id.*

Because Ms. Pakizegi voiced concerns to the Bank that she was being discriminated against after the earlier incidents but failed to seek relief, she is now prevented from proving a continuing violation. Thus, the Dephouse incident and the secretarial transfer denial are no longer actionable in and of themselves, and Ms. Pakizegi's discharge must be treated as a discrete act. Still, the allegations surrounding the Dephouse incident and the transfer denial are relevant as background evidence with respect to the timely charge of alleged discrimination by the Bank in its decision to discharge Ms. Pakizegi. *United Airlines Inc. v. Evans*, 431 U.S. 553, 555, 97 S.Ct. 1885, 1886, 52 L.Ed.2d 571 (1977); *Sabree*, 921 F.2d at 400, n. 9.

ployment continued unabated. Neither Mr. Rogers or Mr. Doggett then fired Ms. Pakizegi. Moreover, the fact remains that Mr. Courtney had become Ms. Pakizegi's supervisor, and he was ultimately responsible for her discharge. The plaintiff fails to proffer any evidence that either Mr. Doggett or Mr. Rogers influenced Mr. Courtney's decision to terminate Ms. Pakizegi's employment.

### 4. The Conspiracy Theory

 Finally, Ms. Pakizegi claims that each criticism alleged against her by co-workers and supervisors regarding her performance at the Bank was unfounded and baseless. Moreover, she claims that the complaints against her were part of a conspiracy by the Bank to have employees make false complaints against her to cover up the fact that the Bank intended to discharge Ms. Pakizegi because she was Iranian. A plaintiff cannot carry the burden of proving discriminatory pretext simply by refuting the employer's articulated reasons for discharging her. *Dea v. Look*, 810 F.2d 12, 15 (1st Cir.1987). Ms. Pakizegi does not dispute the fact that she received numerous reprimands and warnings. Rather, she claims that the underlying criticisms levelled against her by her co-workers and supervisors were false. This contention, however, does not suffice to establish pretext. Ms. Pakizegi cannot simply question the correctness of the complaints, or Mr. Courtney's allegedly misplaced reliance thereon.[2] Instead, she must demonstrate that such reliance was a pretext for unlawful discrimination. This the plaintiff has not done.

Ms. Pakizegi has produced no admissible evidence of a conspiracy by the Bank to manufacture false criticisms of her work to cover up a discriminatory animus in its decision to discharge her. Ms. Pakizegi's claim that "dear friends", whose names she cannot recall, have told her that the Bank made it a practice of coercing employees to articulate baseless complaints about co-workers in order to justify discriminatory discharges is entirely baseless. It strains credulity to argue that alleged statements, from nameless fellow employees, would be admissible to establish that such a Bank policy, in fact, existed.

Ms. Pakizegi has proffered no evidence to satisfy the Title VII requirement that she prove that the Bank was motivated by a discriminatory animus in its decision to discharge her. Thus, because the record is bereft of any admissible evidence to prove unlawful discrimination, Ms. Pakizegi's Title VII claim fails as a matter of law.

### D. *Breach of Contract*

 In Count II of the Amended Complaint, the plaintiff alleges that as of October, 1987, she and the Bank had an implied contract of employment for a period of two and one-half years. This claim is also deficient as a matter of law.

The plaintiff does not contend that she had any written employment contract with the Bank during the course of her employment, but claims that she had an implied employment contract for a term of years. The plaintiff has not, however, identified any writing or proffered any substantive explanation which provides a basis for her claim that an implied contract existed.

The Bank denies that any implied contract for a term of two and one-half years existed, and claims that the plaintiff was an employee at will. In fact, the Bank's employee handbook, which the Bank provided to Ms. Pakizegi when she was hired, expressly stated that the Bank reserved the right to terminate her employment without prior notice. Under Massachusetts law, this suggests that the plaintiff was an employee at will, and that the

---

**2.** Even assuming that the complaints about Ms. Pakizegi's work were false, there is no evidence that Mr. Courtney knew that these complaints had been wrongfully manufactured. Mr. Courtney was entitled to exercise his business judgment and rely upon these complaints from other workers and supervisors in the department. To succeed with a Title VII claim, it is simply not enough to show that the employer made an un-

wise business decision, or an unnecessary personnel move. *Menard v. First Security Services Corp.*, 848 F.2d 281, 287 (1st Cir.1987); *Gray v. New England Telephone & Telegraph Co.*, 792 F.2d 251, 255 (1st Cir.1986). Rather, the plaintiff must prove that she was fired because of discriminatory animus. *Keyes v. Secretary of Navy*, 853 F.2d 1016, 1026 (1st Cir.1988).

Bank could terminate her employment for any or for no reason at all. *See Fortune v. National Cash Register Co.,* 373 Mass. 96, 100, 364 N.E.2d 1251, 1255 (1977). In the absence of any evidence which even remotely supports her assertion that she had an implied contract with the Bank for a term of years with the Bank, Count II must be dismissed as a matter of law.[3]

## IV. CONCLUSION

For the foregoing reasons, the motion for summary judgment of the defendant, First National Bank of Boston, is hereby ALLOWED with respect to both counts of the plaintiff's complaint.

## JUDGMENT

The above captioned matter came before the Court on the motion of defendant, First National Bank of Boston, for summary judgment on both counts of the Complaint of the plaintiff, Yasamin Pakizegi, namely, Count I for national origin discrimination in violation of Title VII, 42 U.S.C. § 2000e, and Count II for breach of an implied contract for employment.

After hearing and due consideration, and in accordance with the Memorandum of Decision filed this date, it is hereby adjudged that Defendant's Motion for Summary Judgment on both Counts of the Plaintiff's Complaint is ALLOWED.

---

**3.** Even if the plaintiff had presented evidence which indicated that she had an oral contract for two and one half years with the Bank, such a contract would be unenforceable because of the statute of frauds. Under the Massachusetts statute of frauds, a contract for services not capable of being performed within a year must be supported by a writing to be enforceable. M.G.L. c. 259, § 1.