**Dawn STEPHENSON, Plaintiff,**

v.

**STATE STREET BANK & TRUST COMPANY, Defendant.**

**Civil Action No. 93–11747.**

United States District Court,
D. Massachusetts.

May 3, 1996.

Winston Kendall, Boston, MA, for plaintiff.

Robert B. Gordon, Bonnie B. Edwards, Ropes & Gray, Boston, MA, for defendant.

**1264**

LINDSAY, District Judge.

Report and Recommendation *Accepted.*

**REPORT AND RECOMMENDATION RE: DEFENDANTS' (sic) MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 25)**

**ORDER RE: DEFENDANT'S MOTION TO STRIKE PORTIONS OF PLAINTIFF'S AFFIDAVIT AND PLAINTIFF'S RULE 56.1 STATEMENT SUBMITTED IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT *(DOCKET ENTRY # 58)***

March 4, 1996

BOWLER, United States Magistrate Judge.

Pending before this court is a motion for summary judgment filed by defendant State Street Bank & Trust Company ("State Street"). (Docket Entry # 25). After conducting a hearing (Docket Entry # 63), this court took the motion for summary judgment (Docket Entry # 25) under advisement.

*PROCEDURAL BACKGROUND*

Plaintiff Dawn Stephenson ("Stephenson"), a former employee of State Street, filed this employment discrimination action claiming that State Street discriminated against her on the basis of her race (black) and her national origin (Jamaican). Stephenson's four count, verified amended complaint seeks compensatory and punitive damages for State Street's breach of an alleged employment contract (Count III) and for its alleged violation of: (1) section four of Massachusetts General Laws chapter 151B ("chapter 151B") (Count I); (2) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") (Count II); and (3) 42 U.S.C. § 1981 ("section 1981") (Count IV). (Docket Entry # 13).

Stephenson began work at State Street as an Account Controller in May 1987. After her July 1990 termination, she filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") based on race and national origin in October 1990. Stephenson described the discriminatory conduct in the MCAD charge as "unfair treatment" and being "treated different" since the beginning of her employment. Stephenson also stated in the MCAD charge that, "[I]n a performance review, I was told that in order for me to obtain a raise I had to receive a course in pronunciation." In addition, Stephenson noted that she was given a written warning in January 1990 due to the loss of one or more bank documents and "excessive money movement" although State Street had no proof that it was Stephenson who misplaced the documents. As set forth in the MCAD charge, after two meetings to discuss the warning, State Street terminated Stephenson "with no cause." (DS Dep. III, Ex. 40).[1]

In March 1993 the MCAD issued a lack of probable cause finding. The case summary delineated Stephenson's allegations as being "subjected to unfair treatment, in that she was told that in order to receive a raise, she had to obtain a course in pronunciation." The MCAD Field Representative described Stephenson's complaint as follows:

Complainant alleges that she has been wrongfully accused of being responsible for losing bank documents and for large overdrafts ... Complainant alleges that Respondent harassed her while she was on short term disability by making her attend meetings regarding the warnings she received.

(DS Dep. III, Ex. 41). The MCAD Field Representative described State Street's response, in part, as being that Stephenson did not "adhere to the Bank's established policies."

In rebuttal, Stephenson alleged, in part, that State Street "manipulate[d] performance evaluations of employees and that this manipulation does not exclude fabrication of documents." (DS Dep. III, Ex. 41). Noting that Stephenson presented a disparate treatment theory of discrimination, the MCAD Field Representative found that Stephenson failed to meet her burden of providing infor-

---

1. The reference to "DS Dep." refers to the deposition of Dawn Stephenson, followed by the ref- erenced volume and exhibit. The depositions are undocketed.

mation "that she was treated differently because she is black and/or is from Jamaica." Accordingly, the MCAD issued a Notice of Final Disposition with the aforementioned lack of probable cause finding. (DS Dep. III, Ex. 41).

Thereafter, Stephenson filed suit. State Street moves for summary judgment on all four counts in the verified amended complaint. With respect to the discriminatory employment counts (counts I, II and IV), State Street contends that it met its burden of production by establishing a legitimate nondiscriminatory reason for Stephenson's termination, i.e., poor job performance, tardiness, absenteeism and misrepresentation of cash book figures, which Stephenson failed to rebut. (Docket Entry # 27).

State Street also argues that Stephenson's assertions regarding discriminatory treatment during her employment, in contrast to her allegations of discriminatory termination, are procedurally barred because Stephenson did not assert these allegations before the MCAD. In particular, State Street submits that Stephenson never raised the alleged discriminatory denial of overtime, special projects and a promotion with the MCAD. Further, State Street contends that Stephenson failed to bring a discriminatory impact theory before the MCAD. (Docket Entry ## 27 & 56).

With reference to the section 1981 claim, State Street maintains that *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), and its progeny foreclose relief with respect to the performance of any employment contract, the conditions of employment at State Street and any discriminatory discharge from employment. Furthermore, Stephenson's denial of promotion claim is barred by the three year statute of limitations, according to State

Street. Finally, State Street argues that its employee handbook does not give rise to an enforceable employment contract. Stephenson was therefore an employee at will and, hence, her breach of contract claim is without merit. (Docket Entry ## 27 & 56).

In light of these arguments, this court finds the following facts viewed in Stephenson's favor from the record solely for purposes of summary judgment.[2]

### FACTUAL BACKGROUND

Stephenson, a black female born in Jamaica, West Indies, began her employment at State Street in May 1987 as an Account Controller in the mutual funds division of the bank. It is undisputed that State Street hired Stephenson as an employee at will. (Docket Entry # 13, ¶¶ 1, 3 & 5; DS Dep. I).

As an Account Controller, Stephenson priced various funds maintained by State Street for its clients. Such work included calculating shares and units of the funds, transferring the information into a computer, printing out the information and, at the end of each day, transmitting the information to State Street's clients. In the course of her duties, Stephenson verified capital stock sales, redemptions and adjustments, verified and entered cash debits and credits for securities settlements and calculated interest accrual rates. She also maintained a cash book, periodically reconciled the "DDA account," and maintained daily summaries and records on trial balance sheets. (DS Dep. I & Ex. 1).

State Street functioned as a custodian of these mutual funds. Its responsibilities included maintaining certain accounting standards. State Street was also responsible for mistakes made in the pricing of the funds. According to both State Street and Stephen-

---

2. Disputes, where applicable, are noted. Additionally, State Street filed a motion to strike portions of Stephenson's affidavit and LR. 56.1 statement. (Docket Entry # 58). Accordingly, this opinion resolves certain portions of the motion to strike to the extent that this court relies on the disputed testimony.

As a separate matter, Stephenson's verified amended complaint, to the extent it sets forth facts based on Stephenson's personal knowledge

or falling within an exception to the hearsay rule, properly forms part of the summary judgment record. In the event a complaint is verified, it is appropriate to consider factual averments based on personal knowledge therein as the equivalent of an affidavit for purposes of summary judgment. *Sheinkopf v. Stone*, 927 F.2d 1259, 1262–1263 (1st Cir.1991). State Street does not move to strike portions of the verified amended complaint.

son, accuracy in the pricing of the funds was important. Inaccurate pricing could result in significant losses of money in a fund. Stephenson's annual performance review in April 1988 set a performance standard of 100% accuracy for unit pricing. The review notes that Stephenson met this standard. (DS Dep. I & Ex. 2; Docket Entry # 29).

During Stephenson's employment, first line managers at State Street directly supervised account controllers. These managers, in turn, reported to the Assistant Vice President and Fund Manager, Stephen P. Wigmore ("Wigmore").[3] A few months after being hired, Mark Manzoni ("Manzoni") became Stephenson's First Line Manager. (DS Dep. I; Docket Entry # 30, ¶ 2).

In August 1987 Manzoni issued a verbal warning to Stephenson as a result of three errors she had made. One of the three errors resulted in a loss to the bank of $5,873.09. Manzoni also cited Stephenson for working overtime due to her lack of speed.

Stephenson disputed Manzoni's criticisms by stating that she had to price an estimated 18 funds and that such pricing did not begin until 5:00 p.m. She also pointed out that a prior supervisor had already resolved one of the three errors. Stephenson also informed Manzoni that the bank had promoted another bank employee, Patrick Conley ("Conley"), who had made errors similar to the errors made by Stephenson. In addition, at or around the time of the warning, Stephenson told Manzoni about Caroline, a white employee, whose error affected one of Stephenson's funds.[4]

The verbal warning required Stephenson to demonstrate a substantial improvement within a certain period of time. Stephenson's August 1987 quarterly review similarly referenced a number of areas for improvement. (DS Dep. I & Ex. 6–8; Docket Entry # 30, Ex. B & C; DS Dep. III).

In April 1988 Stephenson received the aforementioned annual review prepared by Manzoni. Although Manzoni noted difficulties in the areas of absences from work, pricing errors and efficiency, he nevertheless determined that Stephenson successfully met State Street's overall performance standard. (Docket Entry # 30, Ex. A).

Manzoni also suggested therein that Stephenson attend a pronunciation training course offered at the bank. (Docket Entry # 30, Ex. A). Although State Street offers pronunciation courses to employees free of charge (Docket Entry # 30, ¶ 6, sentence two), Manzoni's suggestion offended Stephenson. (Docket Entry # 13, ¶ 15). She avers that, except for Manzoni, no one at State Street experienced any difficulty understanding her speech. (Docket Entry # 51, ¶ 9).

Stephenson complained to Barbara Allen ("Allen") about Manzoni's comment and evaluation. Stephenson advised Allen that other employees committed errors but still received raises and promotions. Stephenson also explained to Allen that Manzoni was telling her to attend a pronunciation class in order to obtain a promotion. She informed Allen that Manzoni was discriminating against her on the basis of her race and national origin, in part, because she spoke

---

**3.** In an affidavit, Wigmore attests to certain conversations he had with Stephenson's supervisors and reiterates what these supervisors said to him about Stephenson's performance. (Docket Entry # 30). State Street does not offer the testimony of these supervisors except for the affidavit of Marka Chandler. Accordingly, Wigmore's statements of what other individuals said to him is hearsay. In relying and referring to these conversations, State Street fails to provide an exception to the hearsay rule. This court, therefore, will not consider the statements for purposes of the truth of the matter asserted.

**4.** State Street moves to strike paragraph 27 of Stephenson's LR. 56.1 statement because it is

hearsay. Referencing Stephenson's deposition testimony, the paragraph reads that, "[Stephenson] told Manzoni that one Caroline, a white female, had made errors in the Ginny Mae Fund. [Stephenson] heard the supervisors talking about it." Having reviewed the deposition testimony, this court accepts the testimony to the limited extent that Stephenson testified that she told Manzoni about Caroline and because she has personal knowledge that the error affected one of her funds. (DS Dep. III, p. 31). This court does not consider the inadmissible hearsay recitation that Stephenson overheard supervisors talking about Caroline's error for the truth of the matter that Caroline made an error.

with an accent due to her Jamaican origin.[5] Thereafter, Stephenson met with Phyllis Hume ("Hume")[6] who apologized for Manzoni's comments. Various officials, including Manzoni, also attended this meeting.[7] (Docket Entry # 51, ¶¶ 12, 14 & 18; DS Dep. III).

State Street eventually promoted Stephenson to a grade level of nine in June of 1988. In November 1988 State Street promoted Stephenson to a grade level of ten. (DS Dep. III).

State Street ordinarily conducted annual performance reviews beginning on the anniversary of the new employee's hiring. An employee's manager performed the review. Depending on whether the new employee met the bank's performance standards, the employee became eligible for a merit increase in salary. Reviews categorized an employee's performance as: (1) not meeting the standard, denominated as N; (2) successfully achieving the standard, denominated as M; and (3) consistently exceeding the standard, denominated as C. Each category corresponded with a particular percentage range of salary increase. As noted above, Stephenson's 1988 annual performance review fell into the second category which corresponded with an estimated three to six percent merit raise. (SR Dep. II).[8]

In October 1988 Stephenson received a verbal warning from Nancy Barrett ("Barrett"), one of Stephenson's supervisors (Docket Entry # 30, ¶ 11, sentence two), for being continuously late to work. At the time Stephenson questioned Barrett as to why other late arriving employees did not receive warnings. (DS Dep. I & Ex. 8).

In or around March 1989 Stephenson became a Portfolio Administrator. As a Portfolio Administrator, Stephenson advised customer representatives how much money each fund contained. She also received instructions from clients through a customer representative to buy or sell various securities and then transmitted these instructions to various departments.

In April 1989 Marka Chandler ("Chandler"), a black female and Stephenson's immediate supervisor at the time, gave Stephenson a favorable annual performance review but noted that it was important for Stephenson to review her work for accuracy. Chandler found that Stephenson's work consistently met all settlement deadlines and that she responded in a timely manner to sell and buy instructions. Chandler additionally characterized Stephenson as "a hard working and dedicated employee." Although she noted Stephenson's difficulty in accepting criticism and her recurring errors in accounting for payables and receivables, Chandler believed that Stephenson had the ability to be a successful Portfolio Administrator. (Docket Entry # 29 & Ex. A; DS Dep. I & II).

Chandler and another State Street employee, Phyliss Schroder ("Schroder"),[9] discussed the review with Stephenson. Stephenson did not sign the review because she disagreed with Chandler's assessment that she had not met the bank's standards in two areas. On the review, Wigmore noted that he and Chandler would continue to work with Stephenson to develop her skills. (DS Dep. I & Ex. 10; Docket Entry # 29).

In September 1989 Stephenson requested a promotion to the position of Tax Accountant. The position, as originally posted, had a grade level of 11. (Docket Entry # 30, ¶ 27). At the time of her request, Stephenson was at a grade level of ten, having been

---

5. This court considers these statements for the purpose of determining the information Allen had before her and not for the truth of the matter asserted, i.e., that Manzoni was discriminating against Stephenson on the basis of her race and national origin.

6. The spelling of Hume's name is taken from Stephenson's affidavit. The court reporter at Stephenson's deposition, however, spells Hume's name as "Phyllis Hughes." (DS Dep. III, p. 17).

7. Stephenson's recitation of what Manzoni said at this meeting in response to a question from Hume is hearsay. The record fails to contain an affidavit or deposition testimony from Manzoni.

8. The acronym "SR Dep. II" refers to volume two of the deposition of Susan Rice.

9. The spelling of Schroder's name is taken from an internal State Street memorandum. (Docket Entry # 47, Ex. I).

elevated from a grade level of eight.[10] Chandler approved Stephenson for the position. According to Wigmore, the position, as originally posted at the bank, did not involve "a substantial raise in pay or change in responsibilities." State Street did not interview Stephenson for the position. After the initial posting of the job opening, however, Nancy Schafer ("Schafer"),[11] the hiring manager with respect to the position, changed the position to require officer level duties. In November 1989 a State Street official advised Stephenson by telephone of the denial of her request because the position had been upgraded to an officer level position. (Docket Entry # 13, ¶ 20(a); DS Dep. III & Ex. 47; Docket Entry # 30, ¶ 27 & Ex. W; SR Dep. I; Docket Entry # 51, ¶ 29).[12]

In January 1990 Chandler issued a written warning to Stephenson.[13] Chandler issued the warning partly because of Stephenson's failure to maintain a standardized filing system and failure to deliver sell instructions on a timely basis. Chandler also believed that Stephenson "was making far too many money movement errors" and "refused to accept constructive criticism." She also chastised Stephenson for her excessive absenteeism, loss of bank documents and not opening her mail. While acknowledging the truth about a number of Chandler's comments, Stephenson testified that she always opened her mail on a daily basis. In addition, she attests that she did not have a secure area in which to place bank documents. At one point in her deposition, Stephenson testified that she "did not lose any bank documents."

The written warning also attached two debit and credit tickets. Stephenson unsuccessfully attempted to question Chandler and Wigmore about the tickets. In closing, the warning advised Stephenson that, absent substantial improvement, she would be issued a final written warning. (Docket Entry # 29, Ex. B; DS Dep. II, Ex. 14; Docket Entry # 51, ¶ 22).

During March 1990 State Street assigned an employee, referred to as a floater, to assist Stephenson in accurately and efficiently performing her duties. A memorandum prepared by the floater notes that Stephenson was "doing much better" and that "things are going well." It also noted, however, that Stephenson committed a number of errors in late March and early April 1990. (Docket Entry # 30, ¶ 16; DS Dep. II, Ex. 15; Docket Entry # 29, ¶ 8).

On or about March 20, 1990, Stephenson attempted to speak with Schroder about the written warning in accordance with the bank's open door policy as set forth in the bank's employee handbook. When Stephenson asked Schroder to substantiate the warning, Stephenson believed that Schroder acted in a threatening manner.[14] Stephenson therefore believed it was futile to attempt to seek further redress within the bank. (DS Dep. II; Docket Entry # 51, ¶¶ 25 & 26).

A March 20, 1990 business memorandum by Schroder reflects that she met with Stephenson, Wigmore and Chandler on March 20, 1990, to discuss the written warning. Therein, Schroder states that she told Stephenson that if she continued certain conduct

---

10. An employee's manager ordinarily determined whether an employee merited an upgrade from a grade eight to a grade ten. The determination depended upon whether an employee met the job standards of grade eight and demonstrated the capability to take on a higher level of work. A manager also ordinarily considered other factors including whether the employee's work was error free, his reliability and his attendance record. (SR Dep. I).

11. The spelling of Schafer's name, which differs from the spelling used by Stephenson (Docket Entry # 50, ¶ 69), is taken from Susan Rice's deposition. (SR Dep. II).

12. The notation "SR Dep. I" refers to volume one of Susan Rice's deposition.

13. Although due to expire on July 8, 1990, Chandler extended the written warning period to August 26, 1990. Stephenson was in an automobile accident in November 1989 resulting in a period of short term disability. She returned to work on or about March 5, 1990. (DS Dep. II, Ex. 14; Docket Entry # 30, Ex. F).

14. This court does not consider Stephenson's statement that Schroder, in fact, "yelled at [Stephenson] and threatened to fire" her (Docket Entry # 51, ¶ 25) for the truth of the matter asserted. Stephenson alleges that Schroder's conduct contravened the open door policy set forth in the manual.

48561

that Schroder would terminate Stephenson's employment on the grounds of insubordination due to her conduct. (DS Dep. III & Ex. 34).

In March 1990 Stephenson requested that the bank provide her with educational assistance. Schroder denied the request because of the warning. State Street provided educational assistance to an employee only in the event that the employee was "performing satisfactorily in [his] job." At other times during her employment, Stephenson availed herself of the educational assistance offered through State Street. (DS Dep. III, Ex. 33 & 34; Docket Entry # 13, ¶ 20(e); DS Dep. II).

Thereafter, Chandler, Allen, Schroder and Susan Rice ("Rice"), Assistant Vice President of Human Resources at the bank in 1989, made the decision to place Stephenson on final warning status. On April 5 or 6, 1990, Chandler issued a final written warning to Stephenson. In addition to noting that Stephenson failed to account for settlements properly in the cash book, Chandler stated that Stephenson repeatedly failed to deliver sell instructions. One such failure consisted of not submitting a sell instruction resulting in an overdraft in the amount of $2,550,-937.50. Chandler explained to Stephenson that if she did not meet the corrective steps outlined in the final warning notice and if she continued to fail to complete her daily tasks in an accurate and timely manner, that she would be terminated. (Docket Entry # 29, Ex. C; DS II, Ex. 17; Docket Entry # 29, ¶ 8; SR Dep. II).

The final warning notice identifies two reasons for the warning. The first reason was the failure to deliver a sell instruction resulting in the aforementioned overdraft. The second reason consisted of four examples where Stephenson failed to complete daily tasks in an accurate manner. With reference to the fourth example, a March 29, 1990 failure to account for a settlement in the cash book, Stephenson testified that she properly accounted for the settlement on March 29,

1990, in the cash book. Stephenson acknowledged that, except for the false recitation about the March 29, 1990 entry, the final warning notice was accurate. (DS Dep. II & Ex. 17; Docket Entry # 30, Ex. H).

On one day in June 1990 Stephenson did not complete her daily trades by the 3:00 p.m. deadline. Stephenson also acknowledged that two other errors noted in an undated, untitled memorandum were factually correct. She testified, however, that another bank employee made an error in excess of $9,000,000 in June 1990 as reflected in an overdraft sheet circulated to controllers and supervisors. (DS Dep. II & Ex. 16; DS Dep. III; Docket Entry # 13, ¶ 17; Docket Entry # 50, Ex. D).

By letter dated July 19, 1990, from Schroder to Stephenson, State Street terminated Stephenson's employment. The stated explanation for the termination was that the bank's outside auditors had discovered that Stephenson's cash book contained two entries that were " 'plugged' to match the trial balance." Although Stephenson questioned two bank officials about the meaning of the term "plugging," she believed that neither official adequately explained or clarified the meaning of the term.[15]

Stephenson denies that she plugged figures in the cash book. She learned about the plugging on the day of her termination. No one at State Street tried to interview Stephenson to determine her views about the termination decision. (DS Dep. II & Ex. 18; Docket Entry # 51, ¶¶ 52 & 53).

Wigmore attests that the decision to terminate Stephenson's employment resulted from the plugged figures and her history of deficient job performance. With respect to the former explanation, the plugged figures violated well established bank policy and, without more, constituted a terminable offense.

Viewing the record in Stephenson's favor and with respect to the latter explanation, Rice could only remember one incident at the bank when Stephenson caused the bank to

---

15. Chandler, who left her position as Stephenson's First Line Manager in June 1990 and therefore lacks direct, personal knowledge about the circumstances of Stephenson's termination, av- ers that the term "plugged" means that Stephenson "falsified numbers in her books so that the totals appear in balance, even though they were not." (Docket Entry # 29, ¶ 10).

actually lose money. The amount of the loss, according to Rice's testimony, was $5,300. In addition, an internal memorandum notes that in the month of May 1990 alone "there were 189 errors in the MFS Securities and Cash Group." The high number of errors evidences that Stephenson's co-workers also made numerous money movement errors.

On the other hand, during Stephenson's employment, State Street disciplined a white, female Account Controller for problems similar to those of Stephenson. State Street eventually terminated the Account Controller's employment after issuing a written warning and a final warning. State Street also disciplined and eventually terminated two white, male portfolio administrators, also referred to as account controllers, for excessive money movement errors, cash book errors, absenteeism and/or failure to meet deadlines. Further, in January and March 1990 State Street issued written warnings to two white, male account controllers or portfolio administrators for money movement errors, pricing errors, inaccurately reporting trades and/or absenteeism. In fact, Stephenson acknowledged at her deposition that she did not know of any other black female effected by the allegedly discriminatory impact of State Street's facially neutral employment practices. (Docket Entry # 30, ¶¶ 23(a), 23(b), 23(c), 23(d) & 23(e); Docket Entry # 29, ¶ 13; DS Dep. III).[16]

Ordinarily, State Street considers discharge as a "last resort." A manager's guide at the bank contains a general outline of the steps to follow for issuing a final warning notice. State Street does not require managers to consult the guide before issuing a final warning notice or to adhere to the recom-

mendations set forth therein. A manager therefore has discretion to determine what errors warrant the issuance of a verbal, written and/or final warning. Typically, although not necessarily with respect to the mutual funds department at the bank, if errors result in a significant loss to the bank or if they affected the quality of an employee's work and/or the bank's reputation as a quality financial institution with accurate accounting, then the manager would issue a warning. (Docket Entry # 30, ¶ 19, sentences three and four; Docket Entry # 47, Ex. E; SR Dep. II; Docket Entry # 47, Ex. I & J).

State Street also had an affirmative action policy during Stephenson's period of employment. Because State Street only maintains its current affirmative action plan and documents, it failed to produce copies of its plan[s] for the years 1987 to 1990.[17] The plan generally established guidelines for the percentage of minorities in various job groups. Rice, however, whose responsibilities included ensuring that managers at the bank abided by the bank's affirmative action policy and rules, had no idea how many black employees worked in Stephenson's division between 1987 and 1990.[18] (Docket Entry # 47, Ex. A & F; SR Dep. I).

State Street also had an employee handbook during the relevant time period. It generally describes State Street's policy of equal employment opportunities without regard to race or national origin and its affirmative action program.

The handbook also contains the open door policy. State Street encourages its supervisors to adhere to the open door policy as set

---

**16.** This court has also reviewed warnings issued to other employees. Two of these written warnings were issued to two white, male portfolio administrators after the termination of Stephenson's employment. (Docket Entry # 30, ¶¶ 23(f), 23(g) & Ex. R & T). With respect to the issuance of a written warning to a black male employee in January 1990, the employee's position at the bank is unclear. (Docket Entry # 30, ¶23(f) & Ex. U). In addition, this court has considered Stephenson's testimony regarding Thomas Dean (DS Dep. II), a white male employed as a Customer Representative who worked a shift which began one half hour later than Stephenson's work shift. (Docket Entry # 29, ¶ 16).

**17.** The plan contained in the record, however, is entitled State Street's Federal Affirmative Action Goals Program—1989.

**18.** Notwithstanding Stephenson's representations to the contrary (Docket Entry # 50, ¶¶ 58, 60; 70 & 71), the record does not contain State Street's answer to interrogatory number ten in exhibit G or its responses to document requests (u), (y) and (ii) in exhibit F. Nor does exhibit G, as submitted, support Stephenson's statement that there were six Caucasian, one Asian and herself in her working group (Docket Entry # 50, ¶ 99).

forth in the handbook. Under the heading "Open Door Policy," the handbook describes a system whereby an aggrieved employee can discuss a grievance with a supervisor. If dissatisfied, the employee can bring the matter to the attention of the supervisor's manager and thereafter to the personnel officer and, if necessary, to the President of the bank. (Docket Entry # 47, Ex. M; SR Dep. II).

Although Stephenson avers that she relied on the handbook (Docket Entry #·51, ¶ 67),[19] it expressly states that, "The policies and procedures summarized in this Handbook have been adopted voluntarily by the bank and are not intended to give rise to contractual rights or obligations or otherwise to restrict the at will nature of the employment relationship." One such policy contained in the manual is the aforementioned open door policy.

The handbook additionally states that, "[I]t is understood that the employment relationship may be terminated at any time by either the employee or the bank." It further reads that the policies and procedures embodied in the handbook "may be withdrawn or changed from time to time at the discretion of the bank." The preface to the handbook describes it as a "guide" which serves as a "reference to answers to questions that may arise during your employment with the bank." (DS Dep. III, Ex. 39–A).

Stephenson acknowledges that no one discussed the terms of the handbook with her. She also did not sign the handbook. Furthermore, she does not remember receiving a copy of the handbook.[20] (DS Dep. III).

Stephenson also avers that there were an estimated 100 employees in the mutual funds group. Only eight of these employees were black, according to Stephenson. (Docket Entry # 51, ¶ 34).

Stephenson additionally attests that State Street did not evenly award overtime "as between white fellow employees and [Stephenson]." (Docket Entry # 13, ¶ 38). Generally, the decision to award overtime rests with the department manager. (SR Dep. II). At her deposition, however, Stephenson could not identify any employee who received more overtime than she had received. (DS Dep. III). Although the record evidences that Stephenson requested overtime (SR Dep. II) and that she observed other employees working when she left at the end of her work shift (Docket Entry # 51, ¶ 37), Stephenson does not remember the amount of overtime she in fact received during her employment. Moreover, during Stephenson's employment, State Street was in the process of minimizing employee overtime as a cost containment measure. (Docket Entry # 30, ¶ 25; Docket Entry # 29, ¶ 15).

Stephenson further asseverates that State Street refused to assign her special projects. (Docket Entry # 13, ¶ 20(f)). On two occasions during her employment, Stephenson asked Chandler for special project assignments. Although Chandler avers that special projects were infrequent, Stephenson testified that, "There were a lot of projects that was [sic] going on." Stephenson admits, however, that she has no facts to support the allegation that Chandler's denial of the requests was racially motivated.[21] (DS Dep. III; Docket Entry # 29, ¶ 14).

Stephenson additionally attests that she asked Chandler for training in a computer program. Although Chandler does not remember Stephenson's request, Chandler is "not aware of any other member of our unit,"

---

**19.** Although Stephenson's deposition testimony reads somewhat to the contrary, this court is obligated to view the record in Stephenson's favor as the nonmoving party. *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir. 1995), *cert. denied,* — U.S. —, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996).

**20.** Rice testified that, although she was not at State Street at the time, she believed that at the time Stephenson began working at the bank, the bank provided employees with copies of the handbook. (SR Dep. I, p. 101). This court will

assume, for purposes of argument only, that State Street distributed the manual to Stephenson when she was hired. As indicated *infra,* however, even if this "evidence" is accepted, the record contains more than enough evidence to allow summary judgment on the breach of contract claim.

**21.** Stephenson generally avers in the verified complaint that State Street's refusal to assign her special projects was racially motivated. (Docket Entry # 13, ¶¶ 19 & 20(f)).

other than herself, "who was ever offered (or took) such a course during" Chandler's "tenure as a First Line Manager." (Docket Entry # 29, ¶ 17, parenthesis in original). Similarly, Stephenson did not know of other co-workers who requested such a computer course. (DS Dep. II).

## DISCUSSION

■ State Street moves for summary judgment with respect to all counts in the verified amended complaint. (Docket Entry # 19). Summary judgment is permissible when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts and all reasonable inferences therefrom are viewed in the light most favorable to the plaintiff, the nonmoving party. *Barbour v. Dynamics Research Corp.*, 63 F.3d at 36.

■ In deciding whether a factual dispute is genuine, this court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord Aponte–Santiago v. Lopez–Rivera*, 957 F.2d 40, 41 (1st Cir.1992) (citing *Anderson*, 477 U.S. 242, 106 S.Ct. 2505 (1986)). A fact is "material" if it might affect the outcome of the suit under the governing substantive law. *Beck v. Somerset Technologies, Inc.* 882 F.2d 993, 996 (5th Cir.1989) (citing *Anderson*, 477 U.S. 242, 106 S.Ct. 2505 (1986)).

■ As the moving party, State Street must affirmatively show there is an absence of evidence to support the nonmoving party's case. *Celotex Corporation v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *Barbour v. Dynamics Research Corp.*, 63 F.3d at 37. Once the moving party carries its burden under Rule 56(c), Stephenson, as the nonmoving party, must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Rather, "the nonmovant 'must present *affir-mative evidence* in order to defeat a properly supported motion for summary judgment.' " *Lawrence v. Northrop Corporation*, 980 F.2d 66, 68 (1st Cir.1992) (summary judgment standard in Title VII action); *see also Lewis v. Gillette, Co.*, 22 F.3d 22, 24 (1st Cir.1994) (where "non-moving party bears the burden of persuasion at trial, however, to avoid summary judgment [she] must make a 'showing sufficient to establish the existence of the elements essential to [her] case' "). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Lehman v. Prudential Insurance Company of America*, 74 F.3d 323, 327–28 (1st Cir.1996) (citation omitted).

## I. Title VII/Section 151B

In Count II, Stephenson brings a claim that State Street violated Title VII. Inasmuch as Stephenson fails to offer direct evidence that State Street treated her differently and/or terminated her because of her race and/or national origin, the burden shifting framework enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), applies. *See Oliver v. Digital Equipment Corporation*, 846 F.2d 103, 107 (1st Cir.1988) (applying *McDonnell Douglas* framework to analogous Title VII claim); *see also Lawrence v. Northrop Corporation*, 980 F.2d 66, 68 (1st Cir.1992).

■ Under the *McDonnell Douglas* framework, the plaintiff must make an initial, *prima facie* showing of discrimination. At this first stage, Stephenson must show "that (1) she was within a protected class, (2) possessed the necessary qualifications for, and adequately performed, her job, (3) but was nevertheless dismissed, and (4) her employer sought someone of roughly equivalent qualifications to perform substantially the same work." *Byrd v. Ronayne*, 61 F.3d 1026, 1030–1031 (1st Cir.1995) (internal quotation marks and citations omitted); *accord Pakizegi v. First National Bank of Boston*, 831 F.Supp. 901, 908 (D.Mass.1993), *aff'd*, 56 F.3d

59 (1st Cir.1995) (summarizing similar framework).

"The burden of establishing a *prima facie* case of disparate treatment is not onerous." *Lehman v. Prudential Insurance Company of America*, 74 F.3d 323, 327–28 (1st Cir.1996) (citation omitted); *Barbour v. Dynamics Research Corporation*, 63 F.3d at 38 (recognizing initial burden in Title VII case as "*de minimis*"). For example, "a plaintiff's evidence of increased responsibilities over time, positive feedback and pay increases" may satisfy "this element, even though the evidence [does] not extend right up to the time of her discharge." *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 n. 4 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995) (summarizing facts establishing *prima facie* case in *Keisling v. SER–Jobs for Progress, Inc.*, 19 F.3d 755, 760 (1st Cir.1994)).

In the case at bar, it is undisputed that Stephenson is a member of a protected class. There is also sufficient evidence to support an inference that she was performing her job in a manner adequate to meet State Street's legitimate expectations. Her 1988 and 1989 annual performance reviews both recognized that Stephenson was successfully achieving the overall standard of performance for her position. While the 1988 and 1989 performance reviews predate her termination by more than one year, they sufficiently raise an inference that Stephenson was adequately performing her job in the summer of 1990. This is particularly true in light of a June 1990 internal memorandum noting the existence of 189 errors in "the MFS Cash and Securities Group" in May 1990.

It is also undisputed that Stephenson was dismissed. She was replaced by Michael Meroski ("Meroski"), a white male. The record also supports the finding that Meroski's qualifications were roughly equivalent to those of Stephenson who had worked at the bank for several years as an Account Controller and a Portfolio Administrator prior to her discharge. Meroski's most relevant experience for Stephenson's position was as an office manager. (Docket Entry # 47, Ex. G).

A presumption therefore arises that State Street engaged in impermissible discrimination. *Smith v. Stratus Computer, Inc.*, 40 F.3d at 15. State Street must therefore "produce sufficient competent evidence, taken as true, to permit a rational factfinder to conclude that there was a nondiscriminatory reason for the challenged employment action, thereby displacing the presumption of intentional discrimination generated in the *prima facie* case." *Byrd v. Ronayne*, 61 F.3d 1026, 1031 (1st Cir.1995). It is worth recognizing that at this second stage State Street's burden "is merely one of production; the burden of persuasion remains [the] plaintiff's at all times." *Lawrence v. Northrop Corporation*, 980 F.2d at 69; *accord Hazel v. U.S. Postmaster General*, 7 F.3d 1, 3 (1st Cir.1993) ("burden of production, not persuasion, shifts to the defendant to articulate a plausible, legitimate and nondiscriminatory justification for the employment decision").

In this instance, State Street more than met its burden of production. It sufficiently articulated nondiscriminatory reasons for its actions, i.e., Stephenson's poor job performance and her apparent fabrication of figures in her cash book so that the totals appeared in balance. The record contains ample evidence for a rational factfinder to conclude that Stephenson was not performing her job adequately enough to avoid losses to the bank. The record also shows a history of absenteeism, irrespective of the automobile accident, and of unnecessary overtime. The nondiscriminatory nature of State Street's conduct is further evidenced by its discipline and termination of a white female Account Controller and its discipline and terminations of two white male portfolio administrators for committing infractions similar to those of Stephenson.

With the employer having articulated a legitimate, nondiscriminatory reason, " 'the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant.' " *Hazel v. U.S. Postmaster General*, 7 F.3d 1, 3 (1st Cir.1993); *accord Greenberg v. Union Camp Corporation*, 48 F.3d 22, 26 (1st Cir.1995) ("if the employer produces a justification, the presumption of discrimina-

tion vanishes"). Inasmuch as the first two elements "are quite easy to meet, it is not surprising that most cases," like the one at bar, "come to rest on the third step." *Villanueva v. Wellesley College*, 930 F.2d 124, 127 (1st Cir.), *cert. denied*, 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991).

At this third stage, it is the plaintiff's burden to present sufficient evidence "for the factfinder to reasonably conclude that the employer's decision to discharge him or her was wrongfully based on" race or national origin. *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 260 (1st Cir. 1994) (action based on age discrimination).[22] The plaintiff "must produce sufficient evidence, direct or indirect, to show that the reasons advanced by the employer constitute a mere pretext for unlawful discrimination." *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 260 (1st Cir.1994). Although "[t]he plaintiff may rely on the same evidence to prove both pretext and discrimination, ... the evidence must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by discriminatory animus."[23] *McMillan v. Massachusetts Society for Prevention of Cruelty to Animals*, 880 F.Supp. 900, 905 (D.Mass.1995); *see Villanueva v. Wellesley College*, 930 F.2d at 128 (no absolute rule that the plaintiff "must adduce evidence in addition to that comprising the *prima facie* case and the rebuttal of [the] defendant's justification").

In the summary judgment context, the plaintiff must "point to evidence which could raise an inference of discriminatory motive underlying the pretextual explanation." *Lawrence v. Northrop Corporation*, 980 F.2d at 69. Stated otherwise, the plaintiff "must elucidate specific facts which would enable a jury to find that the reason given

was not only a sham, but a sham intended to cover up the employer's real motive: discrimination." *Villanueva v. Wellesley College*, 930 F.2d at 127 (internal ellipses omitted); *see Medina–Munoz v. R.J. Reynolds Tobacco Company*, 896 F.2d 5, 9 (1st Cir. 1990) (setting forth similar language).

Viewing the facts and reasonable inferences therefrom in Stephenson's favor, Stephenson had a satisfactory work history at State Street at least up to and including her April 1989 annual performance review. Although Manzoni issued her a verbal warning in August 1987, he did not subsequently issue a written warning prior to the October 5, 1987 expiration of the verbal warning. The verbal warning notes that if Stephenson did not substantially improve her performance during this probationary period, she would be issued a written warning. (Docket Entry # 30, Ex. B).

Thereafter, Stephenson's April 1988 annual performance review notes that she consistently exceeded State Street's expectations in the area of maintaining a neat and orderly work station. She successfully achieved the bank's standards with respect to maintaining proofs of unit pricing, accounting for shares of annuity products, maintaining her cash book, accounting and processing cash letters and posting of pricing information. Although Manzoni rated Stephenson as not meeting the bank's standards with regard to having no pricing errors, absenteeism and timely completion of work, he also stated that she had achieved the necessary technical knowledge and should become a "good [A]ccount [C]ontroller." Manzoni gave Stephenson an overall rating of successfully achieving the bank's standard for her position.

Stephenson's April 1989 annual performance review similarly demonstrated that

---

**22.** The ultimate factual inquiry in both an age discrimination and a Title VII case are the same, i.e., "whether 'the defendant intentionally discriminated against the plaintiff.'" *Rodriguez–Morales v. Veterans Administration*, 931 F.2d 980, 983 (1st Cir.1991). Age discrimination cases may, therefore, constitute relevant precedent in Title VII cases. *Cf. Rodriguez–Morales v. Veterans Administration*, 931 F.2d at 983 (noting the converse that courts rely on Title VII cases as precedent in age discrimination cases).

**23.** In this third stage, the burden on the plaintiff under section 151B is less than it is under federal law. *Lehman v. Prudential Insurance Company*, 74 F.3d 323, 327 n. 2 (1st Cir.1996). Under section 151B, "showing that an employer's proffered reason for an adverse employment action is merely pretextual is sufficient by itself to survive summary judgment." *Lehman v. Prudential Insurance Company*, 74 F.3d 323, 327 n. 2 (1st Cir.1996).

she satisfied the bank's overall standard of proficiency for her grade which had been elevated from the level of eight to the level of ten. In particular, the review recognized that Stephenson reported her cash availability in a timely and accurate manner 95% of the time. She also met the bank's standards for delivering sell instructions on a timely basis and adjusting buys in accordance with the bank's established deadlines. In addition, she consistently met all settlement deadlines. While noting that Stephenson did not meet the bank's standards concerning reconciliation of gold in her cash book on a daily basis and that it was important for Stephenson to review her work for accuracy, Chandler characterized Stephenson as a "hard working and dedicated employee."

In October 1988 Stephenson received a verbal warning for arriving ten to 15 minutes late to work on a number of occasions. Thereafter, she received the previously described January 1990 written warning, the April 1990 final warning notice and the July 1990 termination letter. In light of the discovery by the outside auditors as well as Stephenson's more recent work history, the record weighs quite heavily in State Street's favor.

▮▮▮ Nevertheless, "Strong evidence is not necessarily uncontradicted evidence; and at the summary judgment stage, the district judge cannot 'superimpose his own ideas of probability and likelihood no matter how reasonable those ideas may be upon the facts of record.' " *Medina–Munoz v. R.J. Reynolds Tobacco Company*, 896 F.2d at 9 n. 3 (noting that the plaintiff's record of job performance, although heavily weighted in the defendant's favor, was nevertheless mixed). As pointed out by Stephenson, money movement errors were not uncommon. The month before Stephenson's termination, a State Street official circulated a memorandum noting the existence of almost 200 money movement errors in the month of May. Although Stephenson made several errors, Rice could only remember one error which actually resulted in a loss of money (approximately $5,300) to the bank. (SR Dep. I). Taken together with Stephenson's 1987 and 1988 work history, such evidence is sufficient for a reasonable factfinder to disbelieve State Street's purported reasons for terminating Stephenson's employment.

▮▮▮ In addition, the record contains Manzoni's comment suggesting that Stephenson attend a pronunciation class. Although Manzoni did not participate in the issuance of the final warning notice and the eventual termination of Stephenson, his comments form part of Stephenson's work history and, hence, may have influenced the decision to discharge Stephenson. More relevant and closer in time to the actual termination decision, however, is Stephenson's testimony that no one at State Street gave her the opportunity to respond to the findings of the outside auditors. Although the issue is close, having carefully considered the entire record viewed in Stephenson's favor, this court finds that a reasonable factfinder could conclude that State Street's decision to terminate Stephenson's employment was motivated by a discriminatory animus. Accordingly, with respect to the alleged unlawful termination, Count II survives summary judgment.

Using the same reasoning, albeit examined under the slightly different standard applicable for a section 151B claim,[24] Count I also withstands summary judgment with respect to the alleged unlawful termination.

▮▮▮ Turning to the issues of State Street's alleged discriminatory allocation of overtime, assignment of special projects and

---

24. As explained in footnote number 22, under the third stage in a section 151B claim, the plaintiff need only show sufficient evidence for a reasonable factfinder to conclude that the employer's proffered reason is pretextual. *See Lehman v. Prudential Insurance Company*, 74 F.3d 323, 327 n. 2 (1st Cir.1996); *McMillan v. Massachusetts Society for the Prevention of Cruelty to Animals*, 880 F.Supp. 900, 905 n. 2.

With respect to the second stage, State Street not only articulated legitimate reasons for its decision to terminate Stephenson's employment but it also supported its articulated reasons with underlying facts as set forth in the background section of this opinion and reflected in the affidavits of Wigmore and Chandler. *See Woods v. Friction Materials, Inc.*, 30 F.3d at 263 (setting forth the more restrictive standard for an employer to meet under the second prong to defeat a section 151B claim).

denial of a promotion, State Street argues that, in addition to alleged evidentiary shortcomings, Stephenson failed to raise these claims before the MCAD. Initially turning to the latter argument, in order to bring Title VII discrimination claims in federal court, a litigant must ordinarily exhaust his administrative remedies. Federal claims which relate to the claims brought before the MCAD "must reasonably be expected to have been within the scope of the [MCAD] investigation in order to meet this jurisdictional requirement." *Johnson v. General Electric,* 840 F.2d 132, 139 (1st Cir.1988) (Title VII case); *Powers v. Grinnell Corporation,* 915 F.2d 34, 38 (1st Cir.1990) (citing *Johnson* and applying identical test to age discrimination claim); *Walters v. President and Fellows of Harvard College,* 616 F.Supp. 471, 474–475 (D.Mass. 1985) (applying same analysis to Title VII and section 151B claims); *see Charland v. Muzi Motors, Inc.,* 417 Mass. 580, 583–584, 631 N.E.2d 555 (1994); *Melley v. Gillette Corporation,* 19 Mass.App.Ct. 511, 475 N.E.2d 1227, 1228–1229 (1985), *aff'd,* 397 Mass. 1004, 491 N.E.2d 252 (1986). The general purpose of this requirement is both to provide notice to the employer and the prospective defendant and "to encourage settlement of discrimination disputes through conciliation and voluntary compliance." *Watlington v. University of Puerto Rico,* 751 F.Supp. 318, 324 (D.P.R.1990); *Powers v. Grinnell Corporation,* 915 F.2d at 37.

Stated otherwise, "the scope of a civil action is not determined by the [MCAD] complaint, but is co-extensive with 'the scope of the [MCAD] investigation which can reasonably be expected to grow out of the charge of discrimination.' " *Walters v. President and Fellows of Harvard College,* 616 F.Supp. 471, 475 (D.Mass.1985). As a result, it is not "the specific language of the charge filed with the agency" which controls the nature of the complaint filed in federal court. *Conroy v. Boston Edison Company,* 758 F.Supp. 54, 58 (D.Mass.1991). Rather, the scope of the federal action "may encompass acts of discrimination which the MCAD investigation could reasonably be expected to uncover." *Conroy v. Boston Edison Company,* 758 F.Supp. at 58; *Powers v. Grinnell Corporation,* 915 F.2d at 39 (" 'exact wording

of the charge of discrimination need not "presage with literary exactitude the judicial pleadings which may follow" ' "). Consequently, although the fact that the agency investigated a particular type of discrimination "has evidentiary value," *Conroy v. Boston Edison Company,* 758 F.Supp. at 58, it is not determinative. " 'What controls is not what the [MCAD] did but what it was given the opportunity to do.' " *Borase v. M/A-Com, Inc.,* 906 F.Supp. 65, 68 (D.Mass.1995) (citation omitted). Thus, courts "pay particular attention to the factual statement contained in the charge." *Conroy v. Boston Edison Company,* 758 F.Supp. at 58.

Stephenson's MCAD charge is brief but broad. She begins by stating that she "was terminated from [her] position as Portfolio Administrator.... because of [her] race and national origin." Accordingly, Stephenson is entitled to bring an unlawful discharge claim.

Stephenson, however, goes on to note in the MCAD charge that "since the beginning of my employment," which she identifies as May 4, 1987, she has "experienced unfair treatment from" the bank. Stephenson then gives an example of one of the instances of unfair treatment wherein she "was treated different" during the tenure of her employment at State Street. The example she cites is Manzoni's comment in her 1988 annual performance review about taking a pronunciation course "in order for [her] to obtain a raise."

In light of such language, the scope of the MCAD investigation which can reasonably be expected to grow out of Stephenson's charge includes both the aforementioned unlawful discharge and the unlawful treatment during her employment, i.e., the allegation that she was treated differently during her employment due to her race and national origin. In addition, the particulars of such unfair treatment include the delay of receiving a raise in the spring of 1988. Hence, Stephenson's additional and related allegation that State Street engaged in further discrimination through its denial of a transfer to a grade 11 position reasonably falls within the scope of the MCAD investigation. Similarly, additional acts of unfair

treatment during her employment at State Street (the alleged unlawful denial of overtime and special projects) also can reasonably be expected to grow out of an MCAD investigation where the charge itself alleges "unfair treatment" and being "treated differently" since the commencement of employment in May 1987. *See, e.g., Walters v. President and Fellows of Harvard College,* 616 F.Supp. at 475 (finding involuntary transfer claim similar and related to claims of discriminatory job assignment and demotion). The purpose of the MCAD charge is to initiate the "investigation, 'not to state sufficient facts to make out a *prima facie* case.'" *Powers v. Grinnell Corporation,* 915 F.2d at 39 (quoting *Graniteville Company v. EEOC,* 438 F.2d 32, 38 (4th Cir.1971)). State Street's argument concerning the deficiencies of Stephenson's MCAD charge are therefore unavailing with respect to the allegations regarding denial of overtime, special projects and failure to promote.

State Street also submits that Stephenson failed to raise a discriminatory impact claim before the MCAD and is therefore barred from raising such a claim in the present action. Similar to its arguments with regard to the alleged discriminatory allocation of overtime, the assignment of special projects and the denial of a promotion, State Street also moves for summary judgment on the ground that the discriminatory impact claim is without an evidentiary basis.[25] State Street's arguments with respect to the discriminatory impact claim (Docket Entry # 27, pp. 15–16; Docket Entry # 56, pp. 5–10) have merit.

Stephenson's MCAD charge revolves around State Street's treatment of Stephenson during her employment and her eventual discharge from that employment. The charge makes no mention of State Street's treatment of other employees or of a neutral employment practice which had a discriminatory impact on members of the protected class. And the MCAD Field Representative logically and reasonably construed Stephenson's MCAD charge as raising a disparate treatment theory.

In this respect it is important to recognize that a disparate impact claim is separate and distinct from a discriminatory treatment claim. As such, a disparate impact claim requires different facts to establish a claim for relief. A disparate impact claim arises from facially neutral employment practices which: "'(1) cannot be justified by business necessity and (2) in fact impose harsher burdens on employees who share a protected characteristic.'" *LeBlanc v. Great American Insurance Company,* 6 F.3d 836, 848 n. 12 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994) (citation omitted). In contrast, a disparate treatment claim arises "when an employer treats an employee less favorably than others because of her ... sex.'" *LeBlanc v. Great American Insurance Company,* 6 F.3d at 848 n. 11 (citation omitted).

In light of the above, including the differences in the nature of the discriminatory treatment and discriminatory impact theories and the language of Stephenson's MCAD charge, the scope of the investigation that could reasonably be expected to evolve from Stephenson's initial MCAD charge does not encompass a discriminatory impact claim. *See, e.g., Cogen v. Milton Bradley Company,* 1989 WL 81067 at *4–5 (D.Mass. Jan. 12, 1989).

Nor is the evidence in the record, even when viewed in Stephenson's favor, sufficient to set forth a discriminatory impact claim. "The fact that a neutral discharge

---

**25.** Although this court does not agree with State Street's attempt to parse the verified amended complaint into separate claims for purposes of summary judgment, this court will nevertheless separately address the discriminatory impact "claim." It is important to recognize, however, that the verified amended complaint raises only one Title VII claim and only one section 151B claim based on the bank's conduct throughout Stephenson's employment. Such conduct, as set forth in the verified amended complaint, eventually led to Stephenson's discharge. Inasmuch as evidence of State Street's conduct throughout Stephenson's employment provides, at the very least, background evidence for the factfinder, it serves no useful purpose to characterize the denial of a promotion, the allocation of overtime and the assignment of special projects as separate claims in a case involving one Title VII count.

policy has an adverse effect on a single employee or even a few employees does not itself create such a *prima facie* case." *Holt v. Gamewell Corporation,* 797 F.2d 36, 38 (1st Cir.1986). At a minimum, the plaintiff "must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for ... promotions because of their membership in a protected group." *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 2788–89, 101 L.Ed.2d 827 (1988). The record in this case falls far short of this standard. Summary judgment is therefore appropriate to the extent that Stephenson raises a discriminatory impact claim in counts I and/or II.

■ Turning to the adequacy of Stephenson's claims for discriminatory allocation of overtime and the assignment of special projects, there is nothing to prevent Stephenson from bringing such evidence before the factfinder as background information with respect to her unlawful discharge.[26] Chandler, the individual who issued the January 1990 written warning and participated in the decision to issue the final warning notice, is also the individual involved with respect to the alleged discriminatory allocation of overtime and the assignment of special projects. Although such claims standing in a vacuum are insufficient to show that State Street's explanation for its conduct was a pretext for impermissible discrimination,[27] they nevertheless comprise necessary background information of Stephenson's work history and treatment at State Street by the individual[s] involved in issuing the written warning and the final warning no-

tice which contributed to her purportedly unlawful discharge.

■ The 1989 denial of a promotion to the position of Tax Accountant, however, stands in a different light. In order to establish a *prima facie* case, Stephenson must show that:

(1) [she] applied for an available position; (2) [she] was qualified for an available position; and (3) [she] was rejected under circumstances which give rise to an inference of unlawful discrimination in that [her] failure to be transferred was more likely than not based on consideration of impermissible factors.

*Elam v. C & P Telephone Company,* 609 F.Supp. 938, 946 (D.C.D.C.1984) (citing *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *accord James v. Capital City Press,* 742 F.Supp. 347, 351 (M.D.La. 1990) (applying above standard to allegation of discriminatory denial of training). Stephenson, however, fails to show that she was rejected under circumstances giving rise to an inference of discrimination. It is undisputed that the hiring manager made a decision after the initial posting that the position required officer level duties and responsibilities.

Even assuming *arguendo* that Stephenson establishes a *prima facie* case, State Street offered an adequate explanation, i.e., that the hiring manager decided that the position at issue required a higher level of training and responsibility than originally envisioned. There is no evidence that Schafer acted in a discriminatory manner against Stephenson. Stephenson also fails to produce sufficient

---

26. The issue of the admissibility of such evidence lies solely within the province of the trial judge.

27. As set forth in the factual background, Stephenson only proffered general testimony that State Street allocated its overtime in an uneven manner. At the relevant time period, it is undisputed that State Street was in the process of reducing the overtime hours of employees in the mutual funds division to control expenses. State Street also informed all employees in the mutual funds division of this policy of reducing overtime. State Street therefore proffered an adequate explanation for its conduct. Stephenson, however, fails to offer sufficient evidence to show that this

explanation for reducing overtime was a pretext for a discriminatory animus against Stephenson.

Similarly, Stephenson fails to show that any denial by Chandler of Stephenson's requests for special project assignments was a pretext for unlawful discrimination. Chandler explained that the bank rarely offered special project assignments. In the event such assignments became available, State Street ordinarily awarded such projects to employees who exhibited no problems in efficiently and accurately performing their work. Stephenson failed to show that Chandler's explanation was a pretext for unlawful discrimination.

evidence to create an issue for the factfinder that this explanation lacks credence or that Schafer's conduct was a pretext for unlawful discrimination with respect to Stephenson's application.

▮ Finally, unlike the denial of overtime and the assignment of special projects claims, this claim, which involves the conduct of Schafer, is wholly unrelated to the events leading to Stephenson's unlawful discharge. "The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." *Medina–Munoz v. R.J. Reynolds Tobacco Company*, 896 F.2d at 10. Hence, Stephenson's contentions regarding the denial of a promotion in 1989 are irrelevant to the unlawful discharge claim.

Accordingly, Stephenson's claim concerning the 1989 denial of a promotion to the Tax Accountant position is without merit.[28] To the extent counts I and/or II raise such a claim, they are subject to summary judgment.

## II. *Section 1981*

▮ Relying on the same evidence of discrimination on the part of State Street, Stephenson also seeks to bring a claim under section 1981. Liability under section 1981, however, is more narrowly prescribed than under Title VII. Section 1981 only extends to purposeful discrimination on the basis of race in the making and enforcement of contracts. 42 U.S.C. § 1981; *see McDonnell v. Certified Engineering & Testing Co.*, 899 F.Supp. 739, 751 n. 13 (D.Mass.1995) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 179, 109 S.Ct. 2363, 2373, 105 L.Ed.2d 132 (1989)).[29] As expressed in the seminal case, *Patterson v. McLean Credit Union:*

> Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts.... [T]he right to make contracts does not extend, as a matter of logic or semantics, to conduct by the employer after the contractual relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions. Such post-formation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continuing employment, matters more naturally governed by state contract law and Title VII.

*Patterson v. McLean Credit Union*, 491 U.S. at 176–177, 109 S.Ct. at 2372–73.

▮ Accordingly, section 1981 does not prescribe any of Stephenson's claims which concern post contract formation conduct such as Stephenson's discharge and the alleged discriminatory working conditions at State Street during Stephenson's employment. Such allegations, including the allegation of a discriminatory impact, are not encompassed by section 1981 and therefore subject to summary judgment.

▮ Stephenson's claims concerning the initial formation of any contract in 1987, assuming such a claim exists, as well as any claim concerning the delay in receiving an increase in grade in the spring and early summer of 1988 and the denial of a promotion to the position of a Tax Accountant in the fall of 1989, are time barred under the three year, state borrowed statute of limitations. *Johnson v. Rodriguez*, 943 F.2d 104, 107 (1st Cir.1991), *cert. denied*, 502 U.S. 1063, 112 S.Ct. 948, 117 L.Ed.2d 117 (1992) (Massachusetts' three year statute of limitations for personal injuries applies to section 1981 discrimination claim).

▮ Moreover, such claims do not form part of a serial violation resulting in the tolling of the limitations period. A serial violation, as distinguished from a systemic

---

**28.** This court therefore need not address alternative arguments to dismiss this claim.

**29.** Because section 1981 applies prospectively, *Rivers v. Roadway Express, Inc.*, —— U.S. ——, ——–——, 114 S.Ct. 1510, 1519–1520, 128

L.Ed.2d 274 (1994), the November 1991 amendments to the statute do not apply to this action inasmuch as the conduct at issue arose prior to November 1991.

violation,[30] "is composed of a number of discriminatory acts emanating from the same discriminatory animus." *Jensen v. Frank,* 912 F.2d 517, 523 (1st Cir.1990). Such a violation contemplates a series of separate actionable wrongs "such as when an employee is passed over several times for promotion." *Id.* In contrast, " 'a singular act that brings continuing consequences in its roiled wake' " such as the effects of the discriminatory act do not operate to toll the limitations period. *Johnson v. Rodriguez,* 943 F.2d at 108 (quoting *Gilbert v. Cambridge,* 932 F.2d 51, 58–59 (1st Cir.), *cert. denied,* 502 U.S. 866, 112 S.Ct. 192, 116 L.Ed.2d 153 (1991)). In the case at bar, the delay in receiving an increase in grade and the denial of a promotion are separate and apart from Stephenson's disciplinary difficulties which led to her discharge.

 Stephenson's allegations concerning the delay in the increase of her grade are also unavailing under section 1981. Liability under section 1981 for the failure to promote a plaintiff:

> depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer ... Only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981.

*Patterson v. McLean Credit Union,* 491 U.S. at 185, 109 S.Ct. at 2377. All of the evidence in the record suggests that the delay in receiving an increase in Stephenson's grade level in 1988 did not rise to the level of a new and distinct relation between her and State Street.

 Stephenson's denial of promotion claim with respect to the Tax Accountant position also fails to survive summary judgment on the merits. Liability for damages under section 1981 in a disparate treatment case "is determined according to the same structure of proof as for equitable remedies under Title VII." *Nakai v. Wickes Lumber Company,* 906 F.Supp. 698, 703 n. 5 (D.Me.

1995); *Barbour v. Merrill,* 48 F.3d 1270, 1276 (D.C.Cir.1995) (employing three step framework of proof to establish Title VII claim to section 1981 claim); *Oliver v. Digital Equipment Corporation,* 846 F.2d 103, 111 (1st Cir.1988) (where "a plaintiff seeking to establish a claim pursuant to section 1981 offers indirect proof of purposeful discrimination, the *McDonnell Douglas* formulation applies"); *Lewis v. Gillette Company,* 1993 WL 291771 at *12 (D.Mass. July 21, 1993), *aff'd,* 22 F.3d 22 (1st Cir.1994) ("elements of a § 1981 claim are 'substantially identical' to those of a Title VII claim"). Stephenson failed to adduce sufficient evidence of a purposeful discrimination on the basis of race on the part of Schafer or of any other individual involved in the denial of Stephenson's application. Stephenson also failed to rebut State Street's explanation that there was a legitimate, nondiscriminatory basis for the change in the duties of the position after Stephenson submitted her application. Based on the foregoing, Count IV alleging a violation of section 1981 does not survive summary judgment.

### III. *Breach of Contract*

State Street also seeks summary judgment with respect to plaintiff's breach of contract claim under Count III. As previously noted, Stephenson bases her breach of contract claim on State State's affirmative action goals and employee handbook.

 "[W]hen an employee seeks to show that a personnel manual forms the basis of an employment contract, Massachusetts law requires him to 'establish all of the elements ordinarily necessary for the formation of a contract.' " *Pearson v. John Hancock Mutual Life Insurance Company,* 979 F.2d 254, 256–257 (1st Cir.1992) (citation omitted). Although an employer's dissemination of an employment manual and its adherence to a grievance procedure set forth therein may evidence an employment contract, it is not necessarily sufficient to create a binding employment contract. *See Pear-*

---

**30.** Inasmuch as Stephenson's discriminatory impact claims based on the employee handbook and the affirmative action policies are without merit, her allegations are properly classified as a serial rather than a systemic violation. *See, e.g., Johnson v. Rodriguez,* 943 F.2d at 107–108.

*son v. John Hancock Mutual Life Insurance Company,* 979 F.2d at 257 n. 4 (discussing factors noted in *Jackson v. Action for Boston Community Development, Inc.,* 403 Mass. 8, 525 N.E.2d 411 (1988)). This is particularly true where, as here, the employment handbook contains language indicative of an employment at will relationship.[31] Stephenson acknowledges that she did not sign the handbook. There is no showing that State Street specifically negotiated the terms of the employment handbook or its affirmative action goals with Stephenson. In addition, these documents fail to contain a specified period of employment.

■ To the contrary, the employment handbook reads that the policies in the handbook, including the open door policy, "have been adopted voluntarily by the bank and are not intended to give rise to contractual rights or obligations or otherwise to restrict the at will nature of the employment relationship." The handbook unequivocally reiterates that "the employment relationship may be terminated at any time by either the employee or the bank." It further reads that, the policies and procedures embodied in the handbook "may be withdrawn or changed from time to time at the discretion of the bank." Language in the affirmative action goals program also fails to give rise to a contractual relation. Inasmuch as plaintiff was an employee at will, State Street could terminate her for any reason or for no reason at all. *Pakizegi v. First National Bank of Boston,* 831 F.Supp. 901 (D.Mass.1993), *aff'd,* 56 F.3d 59 (1st Cir.1995).

Count III is therefore properly dismissed on summary judgment.

**31.** "[T]he hallmark of employment at will is its termination by 'either the employee or the employer without notice, for almost any reason or for no reason at all.'" *Pearson v. John Hancock Mutual Life Insurance Company,* 979 F.2d at 257–258 (quoting *Jackson v. Action for Boston Community Development, Inc.,* 403 Mass. 8, 525 N.E.2d 411 (1988), and also noting that concept of at will employment "enables either party to scrap the relationship at any time, without notice or cause").

**32.** Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and

*CONCLUSION*

■ In light of the above discussion, this court **RECOMMENDS**[32] that the motion for summary judgment (Docket Entry # 25) be **ALLOWED** to the extent that counts III and IV are dismissed in their entirety and to the extent that the discriminatory impact and failure to promote claims are dismissed in counts I and II. This court further **RECOMMENDS**[33] that the motion for summary judgment (Docket Entry # 25) be **DENIED** to the extent that counts one and two otherwise survive summary judgment with respect to the allegations of discriminatory treatment during Stephenson's employment[34] and her allegedly unlawful discharge.

The motion to strike (Docket Entry # 58) is **ALLOWED** in part and **DENIED** in part.

Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order. *United States v. Escoboza Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986).

**33.** See the previous footnote.

**34.** As previously explained such treatment provides background information for the factfinder.